## In re Appeal of Times & Seasons, LLC and Hubert K. Benoit

[950 A.2d 1189]

No. 05-409

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 1, 2008

Motion for Reargument Denied March 14, 2008

*David L. Grayck* of *Cheney, Brock & Saudek, P.C.,* Montpelier, for Appellant.

*Geoffrey H. Hand* and *Rebecca Boucher* of *Shems Dunkiel Kassel & Saunders PLLC,* Burlington, for Appellee Royalton Planning Commission.

*William H. Sorrell,* Attorney General, and *Rebecca Ellis,* Assistant Attorney General, Montpelier, for Amicus Curiae State of Vermont.

¶ 1. **Reiber, C.J.** Applicant Times and Seasons, LLC, appeals from the Environmental Board's denial of its request for an Act 250 permit to construct a large gift shop and deli on Dairy Hill Road in the Town of Royalton. Applicant argues that the Board erred in concluding that its project would have an undue adverse aesthetic impact; that it would significantly reduce the agricultural potential of the primary agricultural soils; and that it did not comply with the town plan. We affirm the Board's decision on the first two grounds, and reverse on the third.

¶ 2. John Lefgren owns real property in Royalton, and he is the sole owner of Times and Seasons. In March 2004, Times and Seasons sought approval under Act 250 to construct an approxi-

mately 4,800-square-foot gift shop and deli on Dairy Hill Road in Royalton, near the Joseph Smith Birthplace Memorial. It appears that at the time of the application Hubert Benoit owned the land on which applicant proposed to construct the new gift shop, although the parties had entered into an agreement for Mr. Lefgren to purchase 41.6 acres of Mr. Benoit's land.[1] Mr. Benoit was thus listed as "landowner" on the application. District Environmental Commission #3 denied the application, as did the Environmental Board.

¶ 3. As discussed in additional detail below, the Board first concluded that the proposed project would have an undue adverse aesthetic effect under Criterion 8 of Act 250 because it did not fit within the context of the area and it violated a clear, written community standard intended to preserve the aesthetics or scenic beauty of the area. See 10 V.S.A. § 6086(a)(8). The Board additionally found that the project would have an undue adverse aesthetic effect because applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the project with its surroundings.

¶ 4. The Board next concluded that the proposed project did not comply with Criterion 9(B), 10 V.S.A. § 6086(a)(9)(B), which at that time required that the project would "not significantly reduce the agricultural potential of the primary agricultural soils," or if a significant reduction exists, that four subcriteria set forth in 10 V.S.A. § 6086(a)(9)(B)(i)-(iv) were satisfied.[2] The Board found that there were 2.8 acres of primary agricultural soils on the 7.3-acre project tract, and that the project would significantly reduce the agricultural potential of 1.9 acres of these primary agricultural soils. Having found that this constituted a significant reduction,

---

[1] The parties apparently entered into this agreement in September 2003, but the transaction was not completed until December 2004. In its Act 250 application, applicant explained that Mr. Benoit owned an approximately 100-acre farm, which was to be subdivided along Dairy Hill Road such that the farm retained approximately 60 acres, and the remaining 40 acres would be subdivided into an eight-acre lot for the gift shop and a deferred lot. As noted above, in December 2004, Mr. Lefgren completed his purchase, buying a 7.3-acre lot and a 34.3-acre lot from Mr. Benoit. The lots were described in two separate deeds, and they are located immediately to the west of and fronting on Dairy Hill Road. Mr. Lefgren proposed to build the gift shop on the 7.3 acre lot. Given the completion of this sale, Mr. Benoit's role in this case appears to be limited to that of an adjoining landowner. It is not clear why counsel filed a notice of appeal on his behalf.

[2] This statute has since been amended.

the Board turned to the four subcriteria, and concluded that applicant failed to carry its burden of proof as to all four.

¶ 5. Finally, the Board concluded that applicant failed to meet Criterion 10, which requires that the project conform to "any duly adopted local or regional plan(s)." 10 V.S.A. § 6086(a)(10). The Board found that the project did not comply with the following provision in the town plan: "Where feasible, commercial development shall be located within or close to South Royalton Village or Royalton Village, re-using existing sites where possible, or in other locations specifically recommended in this plan and its amendments." The Board determined that "feasible" in this context meant possible or capable of being done, with a high burden on applicant to investigate all possible alternatives to its proposed project. It also concluded that the phrase "where feasible" (particularly because of the word "where") was more related to physical considerations than economic concerns. Thus, it reasoned that while it would not be feasible for certain types of enterprises to be located in the town center, a project such as this one, which was a typical and traditional commercial use and one that would require fewer than two acres for its building and parking areas, could find a home in the area of the town that the plan noted as suitable for commercial development. Even if it were to construe the term "feasible" in terms of economic and financial considerations, the Board continued, applicant failed to meet its burden of showing that the project would not be financially feasible if located as directed by the town plan. The Board therefore concluded that the project did not comply with Criterion 10. Applicant filed a motion to alter, which the Board denied in material part. This appeal followed.

¶ 6. On review, we presume that decisions made within the Board's expertise are "correct, valid and reasonable" and we "will normally defer to its determinations." *In re Denio*, 158 Vt. 230, 239, 608 A.2d 1166, 1171 (1992) (quotation omitted). The Board's findings of fact are conclusive "if based on 'substantial evidence,' 10 V.S.A. § 6089(c), which is evidence properly before the Board that is relevant and which a reasonable person might accept as adequate to support a conclusion." *Id.* at 236, 608 A.2d at 1170 (citing *In re McShinsky*, 153 Vt. 586, 589, 572 A.2d 916, 919 (1990)). We will affirm the Board's legal conclusions when "they are rationally derived from a correct interpretation of the law" and supported by the findings. *In re S-S Corp./Rooney Hous.*

*Devs.*, 2006 VT 8, ¶ 5, 179 Vt. 302, 896 A.2d 67 (quotation omitted).

¶ 7. Applicant first argues that the Board erred in concluding that its project would have an undue adverse effect on the aesthetics of the area. It maintains that neither the town plan nor the regional plan provides a "clear written community standard" that should be applied to its project. According to applicant, the Board erred by piecing together different parts of the town plan, and the "laundry list" of scenic areas identified as visual assets by the town was too general and too broad to describe exactly what locations were intended to be protected. Applicant also complains that the plan does not contain any standards for what types of development, if any, could occur within identified scenic areas.

¶ 8. The Board employs a two-pronged approach to determine if an application complies with Criterion 8. First, it determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue. *McShinsky*, 153 Vt. at 591, 572 A.2d at 919-20. An adverse impact is considered undue if *any one* of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. *Id.* at 592, 572 A.2d at 920; see also *In re Halnon*, 174 Vt. 514, 515, 811 A.2d 161, 163 (2002) (mem.) (same) (citing *McShinsky*, 153 Vt. at 592, 572 A.2d at 920).

¶ 9. In this case, the Board concluded that the project would have an undue adverse aesthetic impact not only because it violated a clear, written standard but also because applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the project with its surroundings. As the Board explained, applicant had proposed to plant fifteen trees as screening for its project — twelve white pines near the intersection of the project's driveway and Dairy Hill Road and three white pines directly adjacent to the project building. Applicant had not proposed other screening for views of the project from Dairy Hill Road. The Board found this mitigation

inadequate. It explained that although the proposed trees would provide some visual buffer for a neighboring property, it would not screen views of the project from Dairy Hill Road. The Board stated that if it were to approve the project, it would require that applicant provide better and more diverse screening for travelers coming up Dairy Hill Road from Route 14, and such screening would need to be planted on the downhill side of the access driveway. The Board thus found that applicant failed to take available mitigation measures to minimize the aesthetic impact of the project.

¶ 10. Applicant does not challenge this finding on appeal. Because this finding alone supports the Board's conclusion, we need not address applicant's challenge to the Board's finding that the project violated a clear, written community standard. See *McShinsky*, 153 Vt. at 593, 572 A.2d at 920-21 (where record supported Board's finding that proposed project would offend sensibilities of average person, this Court need not examine Board's finding that the applicant also failed to take generally available mitigating steps because an affirmative finding on any one of three inquiries establishes that project will have undue adverse aesthetic impact). We note that applicant asserts that it is willing to add more trees to screen the project and that it would do so in the context of a motion for reconsideration if the Court reverses the Board's decision under Criterion 8 and Criterion 10. However, this argument is irrelevant to the specific issue before the Court in this appeal — namely, whether the Board erred in concluding that the proposed project did not comply with Criterion 8. The Board made a finding of fact that is not challenged. This Court can review only what the Board actually decided in this case and determine if it erred in doing so. Cf. *In re S.B.L.*, 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) (appellant must demonstrate "how the lower court erred warranting reversal"). The Board's unchallenged finding regarding lack of mitigation supports its conclusion that the project does not comply with Criterion 8, and therefore, its conclusion must be affirmed on appeal. See *S-S Corp./Rooney Hous. Devs.*, 2006 VT 8, ¶ 5 (Board's findings are conclusive if supported by substantial evidence, and this Court will affirm Board's legal conclusions where rationally derived from correct interpretation of the law and findings of fact based on substantial evidence).

¶ 11. Applicant next argues that the Board erred in concluding that its project did not comply with Criterion 9(B). Criterion 9(B) provides that a permit will be granted for the development of primary agricultural soils "only when it is demonstrated by an applicant that, in addition to all other applicable criteria, either the . . . development will not significantly reduce the agricultural potential of the primary agricultural soils," or that four specific subcriteria are satisfied. 10 V.S.A. § 6086(a)(9)(B). As noted above, the Board found that the project would significantly reduce the agricultural potential of 1.9 acres of the 2.8 acres of primary agricultural soils on the project tract and that the loss of two-thirds of the primary agricultural soils on the site constituted a significant reduction in the agricultural potential of such soils.

¶ 12. Applicant appears to argue that the Board should have considered 44.9 acres of "prime agricultural soils" owned by Mr. Benoit in evaluating Criterion 9(B). Applicant suggests that the Board should have used this larger acreage because there were 44.9 acres of agricultural soils at the time it filed its application with the district environmental commission, and there were 44.9 acres of agricultural soils at the time that Mr. Lefgren and Mr. Benoit appealed to the Board. Applicant asserts that this figure should be binding, notwithstanding the fact that Mr. Lefgren never intended to purchase nor did he actually purchase this property from Mr. Benoit in December 2004. Alternatively, applicant argues that even if the Board correctly determined that there were only 2.8 acres of primary agricultural soils on the property, there was undisputed expert testimony from its project engineer, Richard DeWolfe, that the project would have an impact only on .5 acres, thereby leaving 2.3 acres of soils available for agriculture.

¶ 13. These arguments are without merit. First, it is not clear exactly what applicant is referring to in its discussion of 44.9 acres of "prime agricultural soils," nor does this argument appear to have been raised with any specificity below. In its brief, applicant cites to prefiled testimony of Mr. DeWolfe, who confusingly states:

> The Project will affect 1.9 +/- acres of marginal prime agricultural soils out of a total of the 44.9 +/- acres of prime agricultural soils owned by Hubert Benoit at the time of conveyance to John Lefgren, and result in the actual loss of only 0.5 +/- acres of the 1.9 +/- acres due to the Project's construction of new impervious surfaces.

■ ¶ 14. It does not appear that this argument was properly raised below or preserved for appeal. Even assuming that it was preserved, however, applicant offers no legal support whatsoever for its assertion that the Board erred by failing to consider land owned by Mr. Benoit in evaluating Criterion 9(B). Mr. Benoit was listed as a "landowner" on the Act 250 application solely because he and Mr. Lefgren had not yet finalized the sale of the project tract. That transaction was completed in December 2004, well before the commencement of the de novo hearing before the Board. Moreover, applicant's own expert, Mr. DeWolfe, testified at the March 2005 hearing that of the 41 acres *actually* conveyed to Mr. Lefgren by Mr. Benoit in December 2004, 2.8 acres (all of which was located on the project lot) were considered prime agricultural land. Mr. DeWolfe stated that the project would have an impact on 1.9 acres of the 2.8 acres, which he conceded was a significant impact on prime agricultural land.

¶ 15. Notwithstanding this testimony, applicant now argues that the Board erred in finding that the 1.9 acres at issue were "primary agricultural soils." According to applicant, these soils do not "support and contribute to an existing economic agricultural operation." Applicant contends that Mr. Benoit's agricultural use of this land was marginal and not profitable. The Board did not address applicant's argument that the soils on the site were not "primary agricultural soils," because applicant raised the argument for the first time in its motion to alter, which was impermissible under Board rules and Board precedent. See Environmental Board Rule 31(A)(1), 6 Code of Vermont Rules 12 003 001-28 (2004). The Board noted, however, that the argument was contrary to the testimony of applicant's own witness, Mr. DeWolfe.

■ ¶ 16. Given applicant's failure to preserve this argument, we similarly need not address it on appeal. We agree with the Board, however, that applicant's argument contradicts the testimony of its own expert witness. It also relies upon an inaccurate definition of primary agricultural soils. The Board applied the correct definition of this term in its decision, see 10 V.S.A. § 6001(15) (Cum. Supp. 2005) (defining "primary agricultural soils"), and the record supports the Board's finding that there were 2.8 acres of primary agricultural soils on the project tract, and that the project would significantly reduce the agricultural potential of 1.9 of the 2.8 acres, which constituted a significant reduction of the agricultural potential of such soils. See *In re Spear St. Assocs.*, 145 Vt. 496,

499, 494 A.2d 138, 140 (1985) (explaining that determination of whether a site contains primary agricultural soils is essentially a factual one, which this Court reviews for clear error). We thus find no error in the Board's conclusion that the project did not comply with 9(B).

¶ 17. We similarly reject applicant's challenge to the Board's evaluation of the four subcriteria set forth in 10 V.S.A. § 6086(a)(9)(B)(i)-(iv). These subcriteria are:

(i) the applicant can realize a reasonable return on the fair market value of his land only by devoting the primary agricultural soils to uses which will significantly reduce their agricultural potential; and

(ii) there are no nonagricultural or secondary agricultural soils owned or controlled by the applicant which are reasonably suited to the purpose; and

(iii) the subdivision or development has been planned to minimize the reduction of agricultural potential by providing for reasonable population densities, reasonable rates of growth, and the use of cluster planning and new community planning designed to economize on the costs of roads, utilities and land usage; and

(iv) the development or subdivision will not significantly interfere with or jeopardize the continuation of agricultural or forestry on adjoining lands or reduce their agricultural or forestry potential.

*Id.*

¶ 18. Turning to the first subcriterion, the Board found that applicant failed to establish the fair market value of its land. It explained that under Board precedent sales price was not a valid measure of fair market value, although it agreed that a bona fide sale could, under defined circumstances, establish a fair market value for subsection (i) purposes. Here, however, applicant merely presented evidence that a sale occurred; it did not describe the circumstances surrounding the sale, and it failed to demonstrate that the sale was bona fide. Thus, the Board could not accept the sales price as evidence of the project tract's fair market value. The Board noted that even if applicant could use the sales price to establish the project tract's fair market value, applicant failed

to meet the other elements of subsection (i): it failed to demonstrate that it could realize a reasonable return on the fair market value of the land *only* by devoting the primary agricultural soils to uses that would significantly reduce their agricultural potential; it did not suggest a reasonable rate of return; and it did not explore or present any alternative projects that would not have impacts on primary agricultural soils as great as the ones created by the proposed project.

¶ 19. As to the second subcriterion, the Board found that applicant presented no evidence concerning the suitability of the approximately 44.5 acres to the west of the project tract, owned by Mr. Lefgren, other than a statement that setting the proposed project near the existing residence would raise aesthetic concerns. Finally, the Board found that applicant merely offered conclusory statements from its engineer that "the project complies with the elements of the alternative test set forth at sub-parts (i)-(iv) of Criterion 9(B)," but presented no other evidence as to subcriteria (iii) and (iv). The Board thus found that applicant did not meet its burden on these subcriteria.

¶ 20. Applicant offers no basis to disturb the Board's findings. Applicant simply reiterates the same conclusory arguments that it made before the Board, arguments that the Board rejected both in its original decision and in its order denying applicant's motion to alter. Applicant asserts, for example, that "Mr. Lefgren showed that the $75,000 he paid Mr. Benoit was a bona fide sale and that the Project was the only means to earn a reasonable return on the investment." The Board found otherwise, and "it is not for this Court to reweigh conflicting evidence, reassess the credibility or weight to be given certain testimony, or determine on its own whether the factual decision is mistaken." *In re Wildlife Wonderland, Inc.*, 133 Vt. 507, 511, 346 A.2d 645, 648 (1975). Applicant's remaining arguments are similarly conclusory and equally unpersuasive. We find no error in the Board's evaluation of the subcriteria set forth in Criterion 9(B).

¶ 21. Finally, we turn to applicant's challenge to the Board's evaluation of Criterion 10, 10 V.S.A. § 6086(a)(10), which requires compliance with a duly adopted town or regional plan. Applicant argues that the provision cited by the Board is unclear and ambiguous and therefore cannot be applied to its project. According to applicant, the requirement that commercial development be located "close to" South Royalton Village or the Royalton Village

is a relative term and it is too vague to provide property owners with notice regarding where development can occur. Similarly, applicant argues that because the term "feasible" is not defined, property owners cannot discern what steps they must take to gain Act 250 approval. Alternatively, applicant argues that its project does comply with the requirement that "where feasible," projects be located "close" to the town villages. It states that its proposed development is "close" to the village under a reasonable understanding of that word, and that it presented evidence that it was not "feasible" to construct the gift shop in the village, however the term "feasible" is defined.

¶ 22. As we recently explained:

> we will affirm the Board's determination of nonconformity [with a town or regional plan] when based on a specific policy set forth in the plan, and stated in language that is clear and unqualified, and creates no ambiguity. Broad policy statements phrased as nonregulatory abstractions, however, may not be given the legal force of zoning laws, which are designed to implement the town plan, and may provide meaning where the plan is ambiguous.

*In re John A. Russell Corp.*, 2003 VT 93, ¶ 16, 176 Vt. 520, 838 A.2d 906 (mem.) (quotations omitted). Thus, "while we generally accord great deference to the Board's decision, we have not hesitated to reverse a finding of nonconformity where the plan sets forth an abstract policy . . . but provides no specific standards to enforce the policy, or is at best, ambiguous and in conflict with applicable zoning provisions." *Id.* ¶ 17 (quotations omitted).

¶ 23. We conclude that the provision at issue here is too ambiguous to be enforced against applicant. As noted above, the plan states that "[w]here feasible, commercial development shall be located within or close to South Royalton Village or Royalton Village, re-using existing sites where possible, or in other locations specifically recommended in this plan and its amendments." Even if we give the words "where feasible" their plain and ordinary meaning, it remains uncertain if the drafters of the town plan intended this phrase to refer to economic feasibility, physical feasibility, some combination of both, or perhaps some other measure of feasibility altogether. We agree with the dissenting

Board members that such ambiguity and uncertainty renders the words meaningless, and therefore unenforceable under Criterion 10. See *id.* ¶ 19 (reversing Board's finding of noncompliance where town plan lacked specific policies or standards and citing similar cases). Given our conclusion, we need not address applicant's remaining challenges to the Board's evaluation of Criterion 10.

*Affirmed in part and reversed in part.*