STATE OF VERMONT

SUPERIOR COURT                          ENVIRONMENTAL DIVISION

}
In re Harvey & West 65-unit Campground    }
    Act 250 Application                  }       Docket No. 110-7-10 Vtec
    (Appeal of True)                     }
}

Decision and Order

Appellant Anne True (Appellant) appealed from the June 4, 2010 decision of the District 5 Environmental Commission granting Act 250 Land Use Permit 5L1522 to Appellee-Applicants Arjay and Robin West and K.A. Harvey's Manufactured Housing, Inc. (Applicants) for a 65-unit campground in Johnson, Vermont. Neither the town nor the regional planning commission entered an appearance in this appeal.

Appellant is represented by Richard E. McCormick, Esq.; and Applicants are represented by James R. Dean Mahoney, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken at the conclusion of the hearing with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings, and to respond to those filings. Only Appellee-Applicants filed any proposed findings of fact and conclusions of law; no response was filed either by Appellant's counsel or by Appellant herself.

Only Act 250 Criteria 1(B), 3, 4, and 8 are at issue in this appeal. Therefore, the District Commission's Findings of Fact, Conclusions of Law, and Order, as well as Act 250 Land Use Permit 5L1522, to the extent that they relate to any of the other Act 250 criteria not at issue in this appeal, remain in effect and are hereby incorporated into this decision.

1

Upon consideration of the evidence as illustrated by the site visit, and of the proposed findings of fact and conclusions of law filed with the Court, the Court finds and concludes as follows.

Applicants propose to develop a campground on approximately ten acres of a 78-acre parcel of land in Johnson, Vermont, with frontage along Route 100C. The Town of Johnson has not adopted a zoning ordinance; it has adopted a town plan and a noise control ordinance. The campground is proposed to be open for business during seven months (or less) of each calendar year.[1]

Route 100C runs in an approximately east-west direction in this location and is used by trucks and through traffic in this area as well as by local traffic. An existing house is located on Applicants' property, close to the roadway and served by an existing driveway. The project property contains open gently rolling meadows for about five hundred feet back from the road, and, over the next thousand feet, rises to an elevation of approximately 80 feet above that of the roadway, at the treeline of a forested plateau area with maple trees used for syrup production.[2] The campground is proposed to occupy areas on the forested plateau and in open areas near the treeline. Easterly and beyond the crest of the hill the property slopes steeply downwards towards Wild Brook. Applicants propose to leave at least a 100-foot vegetated buffer to the brook. Most of the area designated for the campsites is not visible from Appellant's property.

The surrounding property uses are largely residential, with open fields

---

[1] No specific dates or seasons of operation were proposed by Applicants or approved by the District Commission.

[2] A former sugarhouse was removed by Applicants. At trial, Appellant questioned whether the debris of the sugarhouse had been burned properly and pursuant to a burn permit. Any environmental enforcement issues are beyond the scope of the present permit application.

located near the road. A fuel distributor's tank farm (bulk storage) is located to the west along Route 100C, as is the county fair and field days fairground.

Appellant's very small lot, containing an existing two-story house located close to the roadway, is located approximately 400 feet westerly of Applicants' existing driveway. Appellant's 150' x 210' lot is bounded on its easterly, northerly, and westerly sides by Applicants' property. Appellant has lived at her property for seventeen years, and gardens intensively, raising organic vegetables and herbs.

Appellant's existing shallow well or spring is located on Applicants' property approximately 300 feet northerly of Appellant's northerly (back) boundary, near a Class III wetland area and to an existing gravel extraction area in use since before 1970. Appellant's spring is located approximately 100 feet to the west of the limits of the gravel extraction area and was located approximately 100 feet from a beaver pond until the beaver dam was removed at some time in 2010 or the first half of 2011. Appellant's water line runs to within 50 feet of the gravel extraction area. No project construction is proposed within more than a 500-foot radius of Appellant's shallow well.

Applicants' access to the gravel extraction area is from the east, away from Appellant's shallow well and water line. The gravel extraction area is fairly flat, with a slope of less than 3%, so that the risk of erosion is low during the area's use for gravel extraction. The gravel extraction area has been and will be used for material necessary for construction of the project,[3] but not for any off-project purposes, and then will be closed and reclaimed.

Appellant had a new water line put in in December of 2010, as well as having stone installed around the spring and having the ground around the shallow well

_____

[3] The gravel extraction area was used for two to three weeks in the fall of 2010 and for about a week in the spring of 2011.

banked properly to conduct surface water away from the spring. During that work, the spring and the water line were surrounded by groundwater to such an extent that the contractor found it necessary to divert and pump the groundwater away from the area in order to do the work.

As of the fall of 2009 Appellant had a leak in her water line and her drinking water was contaminated with E. coli bacteria. As of that time beavers had built a pond within 100 feet of Appellant's shallow well. Also as of that time heavy equipment was used in the gravel pit to remove material used in building a road not then subject to Act 250 jurisdiction. Appellant had the beaver dam and the beavers removed from the area, and had the shallow well and the water line shocked with chlorine to disinfect it. During the period while her water supply was unfit to drink, Appellant hauled in drinking water.

Appellant did not show that the use of the heavy equipment in the gravel pit caused the break in Appellant's water line, and did not show whether the contamination had entered her water supply due to the break in the water line or due to contamination of the shallow well with contaminated water from the beaver pond. In any event, Appellant did not claim that the repair of the water line and the disinfection of the water supply were insufficient to remedy the past contamination.[4] The new water line has been located and identified in the field.

Appellants propose to extend the existing driveway up the hill so that it first curves to the east, away from Appellant's house, and then curves back to the northwest to the edge of the treeline. The treeline on Applicants' property is located approximately 1300 feet laterally from Appellant's property; the nearest portion of the development area is approximately 1200 feet from Appellant's property.

---

[4] In the present case, the Court must address whether the proposed project will have an adverse effect on Appellant's water supply. Responsibility for past contamination unrelated to this project is beyond the scope of this appeal.

4

Applicants propose to construct a 65-campsite campground primarily within the wooded area, served by a network of camp roadways.

The campground will be served by a new drilled well and will have two bathhouses, toilet facilities, and their associated wastewater disposal systems located up near the active campsite and not down near Appellant's property. Only low-flow plumbing fixtures are proposed for the project. No hazardous or toxic materials are proposed to be used at the campground, other than normal household or commercial cleaning products and products used at the maintenance shop. Applicants have obtained Vermont ANR Wastewater System and Potable Water Supply Permit WW-5-5189-2, Ex. M, approving the amended design and use of the wastewater disposal system for the project, as well as its potable water supply system. Neither it nor the original wastewater system and potable water supply permit was appealed; it became final.

Applicants also have obtained a Transient Non-Community Water System Source and Construction permit from the Water Supply Division of the ANR, Ex. J, approving the new drilled well for the campground sufficient to serve the estimated demand of 6170 gallons per day; it was not appealed and became final. The project plans meet the well isolation zones required by ANR regulations for the project well and for Appellant's and other neighboring water supplies.

The campsites are proposed to be located in clearings within the forested area. Applicants propose to retain as many of the mature maples as possible, consistent with the design of the campsite areas. Many of the campsites are located northeasterly of the height of land and therefore shielded by the height of land from view from Appellant's property.

Applicants propose to construct a welcome center building and a future swimming pool just southerly of the treeline, and to construct a maintenance shop just against the treeline farther to the east. The project buildings have been designed

5

in the style and exterior finish materials to resemble a vernacular sugar house or barn expected in such a setting. An underground electric utility line will provide electric service from the highway to the project site. Only the pool area is proposed to be illuminated by pole-mounted electric lights. These lights are proposed to be shielded to prevent glare from being visible beyond the area intended to be illuminated, and the shielding will prevent glare from being visible from Appellant's property. Exterior lighting on the bathhouses, welcome center, and entry gate, necessary for security purposes, will be supplied by wall-mounted, downward-directed cut-off fixtures with compact fluorescent or LED bulbs. The exterior lighting on the bathhouses is proposed to be motion sensitive, so that it will only be lit when necessary. Each campsite will be supplied with an electric supply pedestal with a small, shielded compact fluorescent fixture mounted on the face of the pedestal.

Approximately 3.2 acres of the site will be disturbed during construction, and approximately one-and-a-half acres of impervious area will be created by the new buildings, roadways, and camping pads. The project will be constructed so that each area of 10 to 15 campsites served by a given loop road will be constructed and stabilized before the next area is begun. The soils on the site are generally well-drained. The development areas typically have slopes of less than 8%. The application includes an erosion control plan, based on which Applicants have obtained ANR approval of coverage under Construction General Permit 3-9020, Exs. Q, R, for erosion prevention and sediment control due to the flow of stormwater during construction.

Once the project is constructed, stormwater falling on the site will flow across vegetated surfaces and infiltrate into the soil, so that no stormwater detention system is necessary to prevent erosion. No evidence was presented that any stormwater falling on the developed area of the site would reach the area of

Appellant's existing shallow well or water line, or reach Appellant's property.

Because of the topography of the project property in relation to Appellant's property, sounds generated up at the location of the campground have the potential to be heard at the location of Appellant's property. Nevertheless, as illustrated during the site visit, earthmoving machinery operated at the location of the proposed welcome center and maintenance building is unobtrusive when experienced from Appellant's property, especially in comparison to the louder sounds of traffic passing by Appellant's property on Route 100C.

An area of existing trees and scrub is located on Applicants' property near Appellant's boundary. In the fall of 2010, Applicants supplemented the screening capacity of this existing vegetation by planting five additional white pine trees on their property near Appellant's boundary to fill in the gaps in the visual screening of the campground from her property. The pines are not in the exact locations as shown in the planting plan in evidence as Ex. Y, but Appellant did not show that any supplemental plantings will be necessary to be added to provide adequate screening from Appellant's house.

Appellant's bedroom is in the middle of the north (rear) side of the upper floor of her house; until the trees grow taller and wider, some vehicle lights and some sounds from the campground will be respectively visible and audible from her bedroom windows. She is able to see only the lower portion of the project property up to the welcome center and the maintenance shop, not the areas of the campsites themselves. Nevertheless, even the elements of the project site that are visible or audible from Appellant's house are nearly a quarter-mile away and, with the proposed conditions and lighting plan, will not be unduly adverse when experienced from Appellant's property. At Appellant's property, sounds at the campsite will be much less noticeable than the traffic passing by on the roadway, but will have to be regulated during the nighttime hours in order not to be obtrusive at

7

Appellant's property.

Applicants propose a set of fourteen unnumbered "Rules & Procedures" for the operation of the campground, to be distributed to all guests at the time they check in to the campground. (Applicants' Ex. 2.) To prevent undue noise, the Rules & Procedures include provision for "quiet hour[s]" from 10:00 p.m. to 7:00 a.m., stating that "[v]oices, music[,] and other sounds can travel," requiring campground guests to "[r]espect your neighbors and maintain a quiet level," and stating that the campground management is "very strict on this." However, the Rules & Procedures do not specifically state that this limitation includes a prohibition on the noise of operating generators during those hours, although Applicants propose to comply with the District Commission's inclusion of generator noise as an unacceptable noise source during the "quiet time." Findings of Fact, Conclusions of Law, and Order, at 12. Electricity is available at each campsite so that the running of generators during the nighttime quiet hours will not be necessary to the guests' use of the camping facilities.

The Rules & Procedures also ask the guests to "[p]lease stay within the campground property" and to "[h]ave respect for our neighbors['] privacy." In addition, Applicants propose to comply with Condition 14 of Land Use Permit 5L-1522 as imposed by the District Commission, requiring them to post and maintain signs along the northern, western, and eastern boundaries of the project property "in order to discourage entry by campers onto neighboring lands."

With regard to the staffing of the campground in case of non-emergency problems or complaints, the Rules & Procedures provide that "[s]taff attendant(s) are available at the welcome center during business hours" and that such attendants are at campsite #1 or at another designated campsite (posted at the welcome center) "during the evenings." It does not provide a staff or contact person during the hours of 10:00 p.m. to 7:00 a.m.

Scope of Appeal and Burden of Proof

Although Question 1 of Appellant's Statement of Questions asks generally whether the Act 250 permit should be denied, Appellant only had standing before the District Commission as to criteria 1(B), 3, 4, and 8 of Act 250. 10 V.S.A. § 6086(a)(1)(B), (a)(3), (a)(4), and (a)(8). As she did not appeal the District Commission's party status ruling regarding any of the other Act 250 criteria, the appeal is therefore limited to criteria 1(B), 3, 4, and 8. Applicants have the burden of proof as to Criteria 1(B), 3, and 4, while Appellant has the burden as to Criterion 8.

Criterion 1(B) (Waste Disposal) and Criterion 4 (Erosion)

Act 250 Criterion 1(B) (Waste Disposal), 10 V.S.A. § 6086(a)(1)(B), requires the project to comply with ANR regulations and not to cause the injection of waste materials or harmful or toxic substances into groundwater or wells. Act 250 Criterion 4 (Erosion), 10 V.S.A. § 6086(a)(4), requires that the project not cause unreasonable soil erosion or a reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result.

Although 10 V.S.A. § 6088(a) places the burden of proof with respect to these criteria on the applicant, 10 V.S.A. § 6086(d) and Act 250 Rule 19 provide that the relevant ANR permits, if provided by the applicant, create a rebuttable presumption that the application meets these Act 250 criteria and is not detrimental to the public health and welfare. See 10 V.S.A. § 6086(a)(1)(B), (a)(4); Act 250 Rule 19(E)(1)(a), (E)(6). In addition, the technical determinations of the ANR in such approvals or permits are to be accorded substantial deference by the District Commissions and hence by this Court in Act 250 proceedings. 10 V.S.A. § 8504(i).

Applicants in the present case also have obtained coverage under the ANR General Permit (Construction General Permit 3-9020) for the stormwater runoff and

9

the erosion prevention and sediment control necessary during construction of the project, giving them the benefit of the presumption as to Act 250 Criterion 4 and as to Criterion 1(B) to the extent that it relates to waste or runoff carried by stormwater. See 10 V.S.A. § 6086(a)(1)(B), (a)(4); Act 250 Rule 19(E)(6). Appellant has failed to come forward with expert or other evidence to rebut the presumption or to overcome the deference due to the technical determinations of coverage under the ANR Construction General Permit.

Applicants in the present case have obtained ANR Wastewater System and Potable Water Supply Permit WW-5-5189-2 approving the amended design and use of the project' wastewater disposal system. That permit gives Applicants the benefit of the § 6086(d) presumption as to Act 250 Criterion 1(B) to the extent that it relates to the wastewater produced by the campground's operation, including the operation of its septic systems and wastewater disposal fields. See 10 V.S.A. § 6086(a)(1)(B); Act 250 Rule 19(E)(1)(a). Appellant has failed to come forward with expert or other evidence to rebut the presumption or to overcome the deference due to the technical determinations of the ANR wastewater permit.

Even without the benefit of the presumptions, Appellant did not present any credible evidence to suggest that stormwater runoff from the project or the wastewater disposal system of the project will cause any unreasonable soil erosion, will cause a reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result, or will cause the injection of waste materials or harmful or toxic substances into groundwater or wells. Accordingly, the proposed project meets Act 250 Criteria 1(B) (Waste Disposal) and 4 (Erosion). 10 V.S.A. §§ 6086(a)(1)(B), (a)(4).

Criterion 3 (Water Supply)

Act 250 Criterion 3, 10 V.S.A. § 6086(a)(3), requires that the proposed project

"not cause an unreasonable burden on an existing water supply, if one is to be utilized." The project uses a new water supply, rather than an existing one, and has received a Transient Non-Community Water System Source and Construction permit from ANR for the construction and use of that new water supply. Technical determinations of the ANR in such approvals or permits are to be accorded substantial deference by the District Commissions and hence by this Court in Act 250 proceedings. 10 V.S.A. § 8504(i). Appellant has failed to come forward with expert or other evidence to overcome the deference due to the technical determinations of the ANR water source permit that the new well will not cause an unreasonable burden on an existing water supply due to the withdrawal of the quantity of water demanded by the project. In fact, Appellant's existing shallow well is located at least 1000 feet from the project's new well, that is, more than twice as far away from the new well as necessary[5] to avoid any effect on the quantity of water in Appellant's well due to the withdrawal of water from the project well.

Nevertheless, it is also necessary to analyze under Criterion 3 whether any other aspect of the project will cause an unreasonable burden on any existing water supply, and, in particular, on Appellant's existing shallow well, especially given the past contamination of that well which Appellant has experienced.

With regard to contamination, in addressing the current application the Court need not determine whether the source of past contamination of Appellant's drinking water was the beaver pond, nor whether the contamination entered by way of Appellant's then-existing shallow well or a broken pipe in Appellant's water line, nor whether use of machinery in the gravel extraction area for an earlier project caused the break in the water line. Instead, it is the Court's responsibility to

---

[5] The required distance of at least 500 feet used in the project application was calculated based on the demand of the project's water supply.

11

determine whether, if the project is completed as proposed, it will not cause an unreasonable burden on Appellant's existing water supply.

Appellant's existing shallow well water supply was improved in 2010 by putting in a new water line and spring, and banking up the earth and stones around it so that surface water does not flow into it. Appellant's water supply has been disinfected and, as of the date of trial, was about to be again disinfected to eliminate any remaining coliform bacteria and render it safe to use as a drinking water source. The location of the water line on Applicants' property has been marked in the field to enable Applicants' workers to conform to a fifty-foot setback between the water line and any gravel extraction activities during the course of the project. The imposition of a condition requiring a 100-foot undisturbed buffer between gravel extraction activities and Appellant's existing shallow well, and requiring a 50-foot undisturbed buffer between gravel extraction activities and Appellant's water line, will adequately protect Appellant's existing water supply during construction. In any event, the gravel extraction area will be closed, seeded, and mulched at the conclusion of the project's construction, and will no longer pose any risk to Appellant's water supply.

The proposed campground project therefore will not cause an unreasonable burden on Appellant's or any other existing water supply, and, with Condition 13 as imposed by the District Commission in Land Use Permit 5L-1522, meets Act 250 Criterion 3. 10 V.S.A. § 6086(a)(3).

Criterion 8 (Aesthetics)

Act 250 Criterion 8 (Aesthetics) requires that the project will not have an undue adverse effect on aesthetics. 10 V.S.A. § 6086(a)(8). With respect to Criterion 8, the burden of proof is on Appellant to show an undue adverse effect. See In re Denio, 158 Vt. 230, 237 (1992); 10 V.S.A. § 6088(b).

The so-called Quechee test, named for a 1985 decision of the former Environmental Board, In Re Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 17–20 (Vt. Envtl. Bd. Nov 4, 1985), provides a two-step methodology for analyzing whether a project will have an undue adverse effect on aesthetics, that is, whether it will fit its context and be in harmony with its surroundings. See In re McShinsky, 153 Vt. 586, 591–93 (1990) (adopting the analysis employed by the former Environmental Board when determining compliance under Act 250 Criterion 8). As recently described by the Vermont Supreme Court in In re Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336, the Court must take the following two-pronged approach to determine if an application complies with Act 250 Criterion 8 as to aesthetics: first, the Court must determine if the project will have an adverse aesthetic impact, and, if so, it must then determine whether the adverse impact will be undue.

With the plantings, exterior lighting, and signage plans now specified by Applicants, and if the campground's guests comply with the quiet hours and anti-trespassing provisions imposed by the campground's Rules & Procedures, the project will not have an adverse aesthetic impact. That is, if these plans are carried out there will not be an adverse aesthetic impact from noise, from campers wandering onto neighboring property, or from lights from campground buildings and vehicles, in particular because the developed area of the campground is remote from potential observers.

However, the potential for adverse impact remains for two reasons. First, although Applicants propose to comply with the District Commission's statement that the operation of generators must be prohibited during the quiet hours from 10:00 p.m. to 7:00 a.m., the Rules & Procedures have not been amended to so specify. Second, no responsible staff attendant or other responsible contact person is provided in the Rules & Procedures during the hours of 10:00 p.m. to 7:00 a.m, to

13

whom Appellant, other neighbors, or other concerned campground guests could direct any complaints about excessive noise.

The Court must therefore turn to the remainder of the Quechee analysis to determine if this potential for adverse impact is undue. Under that analysis, an adverse impact is undue if the project "violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of an area"; if the project "offend[s] the sensibilities of the average person"; or if the applicant has "failed to take generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings." Times & Seasons, LLC, 2008 VT 7, ¶ 8.

The Town of Johnson has no zoning ordinance; its noise ordinance is its only clear written community standard relevant to this application. There is no reason why the operation of the campground as designed, and in accordance with its Rules & Procedures, should violate the noise ordinance. The project therefore does not violate a clear written community standard. Nor does any of the evidence support a conclusion that the proposed campground will offend the sensibilities of the average person.

Finally, Applicants have taken generally available mitigating measures to improve the harmony of the proposed project with its surroundings. They have selected a site for the campsites and associated buildings that is relatively distant from the roadway and from Appellant's property, preserving the open meadows. They have committed to planting screening vegetation, to installing lights designed to prevent glare and unnecessary night-time lighting, and to posting signs to discourage trespass onto neighboring property. The Rules & Procedures of the campground also provide mitigating measures for potential noise impacts from the campground, as long as they are amended to specify that the use of generators is prohibited during the 10:00 p.m. to 7:00 a.m. quiet hours, and are also amended to

14

provide a mechanism for reporting and remedying guests and neighbors' complaints about nighttime noise at the time that it is occurring.

Therefore, with the conditions imposed by the District Commission, and the following additional conditions imposed by this decision, the project will not have an undue adverse effect on aesthetics. The additional conditions are that 1) Applicants shall comply with the planting, lighting, and signage plans submitted in evidence in this proceeding; 2) Applicants shall add to the quiet hours section of the Rules & Procedures a specific prohibition against the use of generators, including the engines of stationary recreational vehicles, during those hours (10:00 p.m. to 7:00 a.m.); and 3) Applicants shall state in the Rules & Procedures, post in the Welcome Center, and provide to Appellant and, on request, to any other neighbor, the contact information for a staff attendant or other responsible contact person with authority to deal with complaints about excessive noise during the hours of 10:00 p.m. to 7:00 a.m.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that approval is GRANTED to Appellee-Applicants' application for the Maple Woods Campground project, with the conditions as imposed by the District 5 Environmental Commission and the additional conditions as stated in this decision. The District 5 Environmental Commission shall perform the ministerial task of producing a revised Act 250 Land Use Permit reflecting the additional conditions.

Done at Berlin, Vermont, this 9th day of November, 2011.


_____
Merideth Wright
Environmental Judge