2014 VT 14

**In re Group Five Investments CU Permit**

[93 A.3d 111]

No. 13-009

Present: **Reiber, C.J., Dooley and Skoglund, JJ., and Kupersmith and Zonay, Supr. JJ., Specially Assigned**

Opinion Filed February 14, 2014

*James A. Dumont*, Bristol, for Appellants.

*David H. Greenberg*, Burlington, for Appellee.

¶ 1. **Reiber, C.J.** This appeal stems from the Superior Court, Environmental Division's affirmance of the zoning board's grant of a conditional use zoning permit to applicant Group Five Investments, LLC, to build and operate a Dollar General store in Ferrisburgh, Vermont. Opponents claim that the trial court erroneously shifted the burden of proof by requiring opponents to show both that the proposed project will have an adverse impact on the area and that existing commercial development in the area has already had an adverse impact. Opponents further contend that the trial court erred in using the *Quechee* definition of undue adverse impact as guidance in interpreting the zoning ordinance. Finally, opponents argue that the trial court erred in failing to rule that the proposed use is prohibited under the applicable zoning ordinance, and that the trial court violated Vermont Rule of Civil Procedure 52(a) by failing to make requested findings on the proposed use of the Dollar General store. We affirm the trial court.

¶ 2. Applicant filed for a conditional use permit in September 2005 to build a Dollar General store on the southeast corner of the intersection of Route 7 and Monkton Road in Ferrisburgh. Applicant describes its retail business as a "general merchandise store that carries everything from food and clothing to pet supplies to cleaning supplies, some electronics, pretty much everything." The Town of Ferrisburgh Zoning Board of Adjustment granted the permit on February 9, 2011, but imposed seventeen additional conditions on applicant. Opponents, local citizens, appealed to the Environmental Division.

¶ 3. After a merits hearing, the trial court issued an order affirming the zoning board's grant of the conditional use permit. In its decision, the court made detailed findings of fact regarding "the project and its site," and the "surrounding neighborhood." Based on these findings, the court concluded that applicant's proposed project complied with all of the performance standards in the Ferrisburgh zoning ordinance, and that the project complied with all of the general and specific conditional use standards of the ordinance as well as the enabling statute promulgated by the Legislature. However, the court imposed the additional requirement that applicant install and maintain a crosswalk across

its parking lot to provide a safe walkway for visitors. The court declined opponents' suggested changes to the proposal, including increased landscaping and relocation of the parking lot and entrance to the back of the building, on the grounds that such changes would provide little benefit and present several disadvantages, such as potential safety issues. Opponents timely appealed the court's ruling.

¶ 4. The Supreme Court reviews the environmental court's rulings on questions of law or statutory interpretation de novo. *In re Vill. Assocs. Act 250 Land Use Permit*, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712. We uphold the environmental court's interpretation of a zoning regulation so long as it is rationally derived from a correct interpretation of the law and not clearly erroneous, arbitrary or capricious. *In re Korbet*, 2005 VT 7, ¶ 11, 178 Vt. 459, 868 A.2d 720 (mem.); *In re Casella Waste Mgmt., Inc.*, 2003 VT 49, ¶ 6, 175 Vt. 335, 830 A.2d 60. As to findings of fact, "the Environmental Court determines the credibility of witnesses and weighs the persuasive effect of evidence, and we will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." *Vill. Assocs.*, 2010 VT 42A, ¶ 7 (quotation omitted).

I.

¶ 5. We begin with opponents' argument that the trial court improperly shifted the burden of proof from applicant by requiring opponents to demonstrate that the proposed project would have an adverse impact. Opponents' argument is without merit. The trial court made detailed factual findings based on the evidence offered by both sides at trial, and concluded based on those findings that applicant had demonstrated that its proposed project met the conditional use criteria — including the requirement that the proposed development not have an adverse impact on the area.

¶ 6. To the extent that the court made statements in its decision such as "[w]ithout a credible factual foundation, we cannot make the legal determination that the proposed project will be adverse to provisions of the [ordinance]," the court was merely reiterating that opponents had not successfully rebutted applicant's showing that it had met the conditional use criteria. In *In re Miller Subdivision Final Plan*, an opponent to a development project similarly argued that the environmental court improperly shifted

the burden of proof by stating that "there has not been evidence presented in this proceeding" to show that the adverse impact alleged by opponent would occur. 2008 VT 74, ¶ 17, 184 Vt. 188, 955 A.2d 1200. We rejected the opponent's argument in that case, noting that "[t]he record, when read as a whole, clearly indicates that the court properly placed the burden on applicant." *Id.* ¶ 18. Similarly, the court here considered the evidence as a whole and ruled applicant had met its burden of proof, both in its denial of opponents' motion for a directed verdict and its final order.

¶ 7. Relatedly, opponents argue that the court improperly required them to demonstrate that the existing commercial use has already had an adverse impact. Opponents base their claim on the following statement in the court's judgment order:

> Interestingly, if the existing commercial developments had detrimental impacts upon this area, we would have expected evidence of such impacts to be presented. Instead, [opponents] presented no evidence to show that the existing commercial developments in the vicinity of this project site have had an unduly adverse impact on the character of this area. Without such evidence, we are hard pressed to conclude that the addition of [a]pplicant's proposed project will have an incremental adverse impact.

Opponents take this language to mean that "[b]y the trial court's logic, any zoning purpose statement or [t]own [p]lan statement that calls for a future character of the area that differs from present uses cannot be considered during conditional use review — absent *proof* that preexisting uses are *actually causing harm*." We do not interpret the court's reasoning so rigidly. The court was not establishing a hard-and-fast rule that opponents of development projects must show ongoing harm from current uses to prove future incremental harm. Rather, the court reasoned that if future commercial development is likely to cause harm in an area with already existing commercial development, then one might expect to see harm from the existing development. The absence of evidence of harm from existing commercial development was a factor the court took into account and found compelling.

¶ 8. Opponents argue that the court's reasoning does not comply with our holding in *In re John A. Russell Corp.*, where we reversed the environmental court's grant of a conditional use

permit because the court failed to assess the differential impact a proposed asphalt plant would have on a predominantly "rural and agricultural" area with no previous industrial development. 2003 VT 93, ¶¶ 31-33, 176 Vt. 520, 838 A.2d 906 (mem.). The facts of that case are distinguishable. The industrial development was at odds with the existing uses in the area. Further, we held that the environmental court did not sufficiently analyze the project's cumulative impact, such as evaluating complaints about noise from neighbors and assessing the increase in truck traffic. *Id.*

¶ 9. ■ Here, by contrast, the proposed commercial development is to an area that already has commercial uses. Further, the court made specific findings regarding the project's impact on traffic and noise that supported its conclusion that there would be no increased impact. The court noted that the proposed project will host a single business, not a strip mall or other conspicuous entity, and that it is already surrounded by commercial developments, including several large barn structures. Further, unlike *John A. Russell Corp.*, where the court did not make adequate findings as to the impact of noise and additional traffic, here the court considered evidence as to both of these factors and concluded that there was no adverse impact. This analysis did not improperly shift the burden onto opponents or fail to address their claims regarding an incremental shift in the character of the area, but rather evaluated opponents' arguments and found them unconvincing. See *In re Miller*, 170 Vt. 64, 70, 742 A.2d 1219, 1224 (1999) (holding that the court's findings were not clearly erroneous when supported by applicant's evidence, albeit disputed by the project's opponents). Therefore, we conclude that the trial court did not improperly shift the burden of proof onto opponents.

## II.

¶ 10. Next, we address opponents' argument that the environmental court erroneously applied the legal standard from the *Quechee* test in Act 250 Criterion 8 to the conditional use review here to determine the adverse effect on the "character of the area." See 24 V.S.A. § 4414(3)(A). Our review of the environmental court's determination of whether a proposed project will have a material adverse impact is deferential, meaning that we will uphold the court's determination unless it is clearly erroneous. *John A. Russell Corp.*, 2003 VT 93, ¶ 30.

¶ 11. The Vermont Legislature has authorized municipalities to condition land development on specific and general standards, so long as the municipal standards conform to the standards in the enabling legislation. 24 V.S.A. § 4407(2) (repealed 2004).[1] In § 9.4 of its zoning ordinance, the Town of Ferrisburgh set general and specific standards governing conditional uses. The "General Standards," § 9.4(A), require the zoning board to determine that "the proposed use will not adversely affect . . . [t]he character of the area affected." The court determined that Bylaws § 9.4 conformed to the enabling legislation, and consequently found the Bylaws provisions controlling on the issue of the conditional use standards. In interpreting the "adverse[ ] [e]ffect" language of § 9.4(A), the court took guidance from the *Quechee* definition of "undue adverse impact" commonly used in the context of reviewing a state land use permit application under Criterion 8 of Act 250.[2] See *Times & Seasons, LLC*, 2008 VT 7, ¶ 8; *In re McShinsky*, 153 Vt. 586, 591, 572 A.2d 916, 919-20 (1990).

---

[1] In its original opinion, the court noted that "[t]here is one slight but notable difference between the enabling statute and the Bylaws," because the statute states that "the proposed conditional use shall not result in an undue adverse effect on any of" the municipality's adopted general standards, see 24 V.S.A. § 4414(3), whereas Bylaws § 9.4 requires a determination "that the proposed use will not adversely affect" the general standards. Later, in an amended opinion, the court acknowledged that it had mistakenly applied the newer statute, § 4414(3), to this case when the older statute, § 4407, was actually controlling. Although enacted in 2004, § 4481 gave the town until September 1, 2011 to update its ordinance to comply with the mandates of § 4414(3). Because the application here was filed in September 2010 and the town had not updated its ordinances, § 4407 continued to govern the application. However, this correction did not ultimately affect the court's reliance on the *Quechee* standard or its adverse impact definition.

[2] We have described the *Quechee* test as follows:

First, [the Board] determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue. An adverse impact is considered undue if *any one* of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

*In re Times & Seasons, LLC*, 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d 1189 (citation omitted). This Court has approved the use of the *Quechee* test in Act 250 cases. *Id.*

¶ 12. The court reasoned that although the "undue adverse effect" contains an extra term — "undue" — this standard is "interchangeable in application" to the determination of whether a development will have an adverse effect. First, the court noted that the *Quechee* standard constituted a "common-sense definition of 'undue adverse effect.'" Second, the court recognized that the *Quechee* definition of "undue adverse effect" was "common knowledge" to the Legislature when it adopted that term in its revision of the conditional use enabling statute. Thus, the court concluded that the Legislature "intended analysis of applications for municipal conditional use approval to be guided by the two-pronged test employed in *Quechee*." Finally, the court noted that this Court has held "that the adverse effect test [referenced in zoning municipal ordinances] must be applied reasonably to prohibit only substantial and material adverse effects." *In re Miller*, 170 Vt. at 69, 742 A.2d at 1223. The court concluded that there was little difference between "undue" and "substantial and material" adverse effects, and interpreted the "adverse effects" provision of the town zoning ordinance consistently with the *Quechee* definition.

¶ 13. Opponents contend that the court's use of the *Quechee* standard was clearly erroneous. They argue that Criterion 8 of Act 250 is distinguishable from § 9.4(A) of the town zoning ordinance because Act 250 does not include preservation of the "character of the area" as an explicit statutory criterion; because Criterion 8 only protects areas of scenic and natural beauty, and communities may possess valuable attributes beyond scenic beauty; and because the purpose of Act 250 is only to address large-scale changes in land use, not incremental impacts of smaller changes. See *Comm. to Save Bishop's House v. Med. Ctr. Hosp. of Vt.*, 137 Vt. 142, 151-52, 400 A.2d 1015, 1020 (1979).

¶ 14. ▮ We conclude that the court did not err in using the definition of undue adverse impact from the *Quechee* test as guidance for interpreting the adverse effect language of Bylaws § 9.4(A). The court did not apply the *Quechee* test in its entirety, but was merely guided by the definition of undue adverse impact from the *Quechee* analysis in order to inform its interpretation of the adverse effect language in the Bylaws. Rather than examining the undue adverse impact on those elements contained in Act 250, the court properly examined the adverse effect on the specific items listed in the Bylaws, including: "1) The capacity of existing or planned community facilities. 2) The character of [the] area

affected. 3) Traffic on the roads and highways in the vicinity. 4) The [t]own [p]lan and bylaws in effect. 5) Utilization of renewable energy resources. 6) The appropriate use or development of adjacent property." The court found, based on the evidence, that the proposed development posed no adverse impact as to any of these areas. Therefore, opponents' arguments that the court's analysis was faulty because Act 250 does not does not call for an analysis of the character of the area and applies only to large-scale projects is without merit. Even if opponents were correct in their interpretation of Act 250, their argument bears no relevance because the court merely used the definition of undue adverse impact from the *Quechee* test, not the elements to which the definition applied.

¶ 15. ■ Further, we agree with the environmental court's application of our analysis in *Miller* to this case. In that case, we held that for the purposes of interpreting a zoning ordinance in accordance with the enabling statute, the "adverse effect test must be applied reasonably to prohibit only substantial and material adverse effects." 170 Vt. at 69, 742 A.2d at 1223. The case that we cited for that proposition, *In re Walker*, 156 Vt. 639, 639, 588 A.2d 1058, 1059 (1991) (mem.), elaborates on our reasoning underlying the substantial and material adverse effects test. In *Walker*, we rejected a project opponent's literal reading of the ordinance and its consequent argument that "if *any* adverse effect is found, the permit must be denied." *Id.* We reasoned that "[a]ny conditional use will have some adverse effect . . . . If appellant's approach were adopted, it would require the denial of all conditional use permits, an irrational result contrary to legislative intent." *Id.* Accordingly, we upheld the trial court's application of the "material-adverse-effect standard," stating that this standard "facilitates a rational result consistent with legislative intent and sound statutory interpretation." *Id.* Although we interpreted the enabling statute in that case, the same reasoning applies to the conditional use ordinance at issue here.

¶ 16. ■ Opponents further argue that the court overlooked the town's intentions for development, as expressed in the town plan and the Bylaws. In particular, opponents point to chapter 4 of the town plan, which provides that "[p]rotecting the Route 7 corridor is critical to maintaining the rural character and quality of life Ferrisburgh residents currently enjoy. . . . Preventing the highway

corridor from becoming a fully developed commercial strip should be a principal purpose of the town's regulations." To this end, the plan states that "[t]he size, scope and impact of commercial uses along the state highway should be subject to site plan review to protect neighboring residences, the visual character and transportation function of the highway and to further the goals in the town plan for economic development." Opponents' expert testified that the proposed project contradicts these provisions of the plan. However, rather than providing specific standards, these provisions contain general statements. "Broad policy statements phrased as nonregulatory abstractions . . . may not be given the legal force of zoning laws." *In re John A. Russell Corp.*, 2003 VT 93, ¶ 16 (quotations omitted). These general statements in the plan are insufficient to create a legally binding standard.

¶ 17. ▉ Opponents also rely on the Bylaws for the Highway Commercial District, where the proposed development will be located, which state: "It is the primary policy of this district to provide an area to serve highway oriented businesses and highway uses. The size of the commercial uses should be restricted to protect the residential character and traffic access in this and adjoining districts." Contrary to opponents' assertion that the proposed development contradicts this section of the Bylaws, the court correctly noted that "[t]he [t]own [p]lan specifically identifies the area of the proposed project as having a high concentration of commercial development," and encourages this development "so that there will be less development pressure in 'low-density residential or open space/agricultural land.'" Moreover, the court examined the evidence that the new store would cause an incremental adverse impact, but disagreed with opponents' arguments.

¶ 18. For these reasons, the environmental court did not err in its evaluation of whether this development project would have an adverse effect on the elements enumerated in the Bylaws.

III.

¶ 19. Finally, we address opponents' argument that the trial court erred in failing to rule that the proposed Dollar General store is a prohibited use in this district, and that the trial court violated Vermont Rule of Civil Procedure 52(a) by failing to make requested findings on the nature of the proposed Dollar General use.

¶ 20. ■ As to the findings argument, opponents contend that the court failed to make specific findings regarding the type of store the proposed project was. The court characterized the Dollar General as a "discount retailer," and stated that "Dollar General's stated company slogan is 'today's general stores.' Evidence presented at trial did not include any presentation that the general public shares this self-assessment." Although the court's findings as to the proposed use were not particularly detailed, they are adequate for purposes of applying the ordinance and for purposes of Civil Rule 52. Moreover, these findings were supported by applicant's trial testimony that the store would be "a general merchandise store that carries everything from food and clothing to pet supplies to cleaning supplies, some electronics, pretty much everything. It's . . . a lot of different products." This was sufficient to show that the court considered the store a retail store.

¶ 21. Next, opponents contend that the environmental court should have treated applicant's proposed project as "convenience, retail" rather than "retail sales," as those terms are defined in § 2.2 of the zoning bylaws. The Bylaws define these terms as follows:

> CONVENIENCE, RETAIL: Shall mean an establishment whose principal use is the sale of products in small quantities for the daily use of customers including, but not limited to, bakeries, food stores, news stands, tobacco shops, card shops, liquor stores, delicatessens, musical supply stores, pet stores, jewelry stores, camera and photography supplies, ice cream parlors, meat and seafood shops and florist shops.
>
> . . . .
>
> RETAIL SALES: Shall mean an establishment whose principal use is the sale of products for consumption or use by the customer off the premises. This shall include but not be limited to hardware, paint, office equipment, sporting goods, trading stamp and redemption outlets, television, satellite dishes, automotive supply and major household appliance stores.

¶ 22. Section 4.4(B), governing the Highway Commercial District where the proposed project would be located, provides twenty-four conditional uses, including "retail store" but not "convenience,

retail." Opponents argue that because the proposed store is a "convenience, retail" store, it is prohibited in this district.

¶ 23. ■ We construe the ordinance according to the general rules of statutory interpretation. *In re Laberge Moto-Cross Track*, 2011 VT 1, ¶ 8, 189 Vt. 578, 15 A.3d 590 (mem.). We interpret an ordinance's "words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." *In re Champlain Coll. Maple St. Dormitory*, 2009 VT 55, ¶ 13, 186 Vt. 313, 980 A.2d 273 (citation and quotations omitted). "We adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." *In re Lashins*, 174 Vt. 467, 469, 807 A.2d 420, 423 (2002) (mem.) (citation and quotation omitted).

¶ 24. ■ Here, a common-sense interpretation of the ordinance includes a retailer such as the Dollar General store among the conditional uses intended by the ordinance. First, the store's proposed use as a discount retailer fits comfortably into the retail sales definition provided in the ordinance, as the goods sold in a "general store" or "discount retailer" are generally "for consumption or use by the customer off the premises." Second, the retail sales definition includes the language "this shall include but not be limited to," meaning that the definition was intended to be inclusive rather than restrictive. Finally, § 4.4(B)(24) of the Bylaws is similarly inclusive, in that it includes a catch-all provision for "[o]ther similar uses which meet the intent of purpose statement upon finding . . . that such use is of the same general character as those permitted and which will not be detrimental to the other uses within the District or to the adjoining land uses." The proposed store fits the retail sales definition, but even if it did not, it is sufficiently similar to the retail sales definition to fit into the catch-all provision in § 4.4(B)(24).

*Affirmed.*