# STATE OF VERMONT

SUPERIOR COURT                                  ENVIRONMENTAL DIVISION

| | |
|---|---|
| **HARRISON CU APPLICATION** | **Docket No. 49-5-16 Vtec** |
| ****************************************** | ****************************************** |
| **HARRISON SP APPROVAL** | **Docket No. 95-8-16 Vtec** |

## DECISION ON THE MERITS

James and Janet Harrison (the Harrisons or Applicants) seek permission to create a rock and sand quarry (the Project) on their property located off VT Route 104A and 1547 Skunk Hill Road in the Town of Georgia, Vermont.  The Harrisons received conditional use approval for the quarry from the Town of Georgia Zoning Board of Adjustment (ZBA) and site plan approval from the Town of Georgia Planning Commission (Commission).  A neighboring property owner, William A. Mraz (Mr. Mraz or Appellant), timely appealed both decisions to this Court; the conditional use permit appeal was filed May 24, 2016 and the site plan approval was appealed August 25, 2016.  The conditional use permit appeal was assigned Docket No. 49-5-16.  The site plan approval was assigned Docket No. 95-8-16.  The Court coordinated both matters to be jointly tried.

The Harrisons are represented in this proceeding by Christopher D. Roy, Esq.  Mr. Mraz is represented by Andrew H. Montroll, Esq.  The Town of Georgia is participating as an interested party and is represented by Joseph S. McLean, Esq.  Sandra C. Read is also participating as an interested party, and is self-represented.

The coordinated trial occurred on January 25 and 26, 2017 in the Franklin County Civil Division in St. Albans, Vermont.  On the morning of the first day of trial, the Court conducted a

-1-

site visit at the proposed quarry site that was attended by Mr. Harrison, Mr. Mraz, their attorneys, and Mr. Harrison's expert witnesses. The purpose of the site visit was to provide context; no evidence was taken during the visit.

At the outset of trial, the Court allowed Mr. Mraz to amend his Statement of Questions in the conditional use permit appeal to add two new issues related to steep slopes and setback requirements. The Motion to Amend the statement had been filed just two days prior to the trial. The Court generally takes a liberal view in granting such motions, preferring to resolve cases based on merits rather than procedural concerns.

Following the close of evidence, on March 2, 2017, the Harrisons filed a Motion to Reconsider the Court's decision granting the amendment to the Statement of Questions. Mr. Mraz responded in a March 17 filing. The Court held a hearing on the matter on April 3 in the Chittenden Superior Court in Burlington, Vermont. On April 18, the Court issued an entry order in which it granted the Harrisons request to reconsider, reversed its previous decision to allow the new questions, and denied Mr. Mraz's Motion to Amend. Harrison Conditional Use, No. 49-5-16 Vtec (Vt. Super. Ct. Envtl. Div. April 18, 2017) (Walsh, J.). The Court concluded first, that Mr. Mraz's late hour amendment constituted undue delay, and second, allowing the new questions would prejudice the Harrisons' case because they were not provided sufficient notice to either prepare legal arguments or modify their proposal accordingly. Id. at 4.

At the April 3 hearing, the parties stipulated to the admission into evidence of the Town of Georgia 2011 Comprehensive Municipal Plan (Town Plan). The parties were also provided an opportunity to file supplemental post-trial briefs based on the Court's April 18 decision. The parties filed briefs on May 12 and the Harrisons filed a response on May 26.

Based on the evidence admitted at trial, the Court renders the following Findings of Fact, Conclusions of Law, and the accompanying Judgment Order.

**Findings of Fact**

1. James and Janet Harrison own the subject property, which consists of approximately 103.5 acres located southeasterly of, and adjacent to, Applicants' existing concrete batching plant at 1803 Skunk Hill Road in Georgia, Vermont.

2.      The Harrisons originally applied to the ZBA for conditional use approval of a sand and rock quarry on August 14, 2013.

3.      That application sought approval for truck access to the quarry from Skunk Hill Road. Neighbors on Skunk Hill Road objected.

4.      The ZBA denied the Harrisons' application for conditional use approval on October 15, 2013.

5.      The Harrisons appealed the ZBA's decision to this Court, then later withdrew the appeal.

6.      The Harrisons' current proposal is to build an access road to the Project off VT Route 104A (Route 104A or State Highway) across from Arrowhead Lake Road. Trucks will use the proposed access road to enter and exit the quarry for all outside sales of quarry product.

7.      The Harrisons resubmitted their quarry plans to the appropriate municipal panels, and sought state approval to build the proposed access road across the state's right-of-way on VT Route 104A.

8.      The ZBA application and the site plan review are governed by the version of the Town of Georgia Zoning Regulations (Regulations) that took effect as of October 14, 2013.

9.      The Project is in the AR-1 Agricultural/Rural Residential District (AR-1 District).

10.      "Earth Resource Extraction" is defined in the Regulations as "[t]he extraction of minerals, including solids such as sand and gravel, liquids such as water, and gases such as natural gas. This use may also include preparation activities such as crushing and washing customarily part of the mining/quarrying activity."

11.      "Earth Resource Extraction" is listed in the Regulations as a conditional use in the AR-1 District.

12.      Applicants intend to develop the quarry on approximately one-quarter of the Project site, or 26 of the site's 103.5 acres.

13.      The Project includes the quarrying, mining, drilling, blasting, extraction, crushing, screening, processing, and hauling of rock, stone, and gravel. The equipment expected to be used includes excavators, loaders, a rock drill, a wash plant, haul trucks, and customer trucks.

14.      The Project also includes the operation of a portable crushing and screening plant.

15. The Harrisons propose to remove 1.05 million cubic yards of rock and sand over a 16-year period with an average annual extraction rate not to exceed 67,200 cubic yards per year on average, and not to exceed 80,640 cubic yards in any given year.

16. Construction of the proposed access road, which will occur during the first year of the quarry's operation, is expected to generate about 75,000 cubic yards of aggregate material for sale.

17. The proposed road construction will take about three to four months to complete and will involve 2.96 acres.

18. Applicants propose two extraction areas: a 7-acre northern extraction area and a 19-acre southern extraction area. Each extraction site will have a stock pile area.

19. Aggregate extracted from the north area will be used by the Harrisons' adjoining Ready Mix concrete plant. An internal access road will connect the extraction area to the existing Harrison Concrete facility.

20. The adjoining Ready Mix plant currently uses aggregate from off-site locations in Milton, Swanton, and Berkshire.

21. Aggregate extracted from the south area will be sold to customers who will truck it out by the proposed access road onto the State Highway; the aggregate also will be used by the adjoining Ready Mix plant.

22. A conveyor system internal to the site will transport aggregate from the south area to the north area, over a 75-foot bridge spanning an unnamed stream.

23. Due to the use of onsite aggregate material, the proposed Project is expected to reduce or eliminate traffic from trucks bringing outside aggregate on Skunk Hill Road to the existing Harrison Concrete facility.

24. The proposed quarry will be closed between December 15 and April 15 of each year.

25. While open, the proposed quarry will operate only between the hours of 7 a.m. and 5 p.m. from Monday through Friday . It will not operate on weekends.

26. The proposed access road is generally expected to carry 25 trucks per day, or 50 truck trips, and 5 to 6 employee trips. The trucks, which will enter empty and exit loaded, will be covered to prevent rocks and sand from spilling onto the road.

27.     At its maximum output, the quarry is expected to generate 100 trips per day with 50 trucks on the local roads.

28.     Route 104A currently carries 3,800 to 5,400 vehicles per day in the vicinity of the Project site.  The traffic added by the quarry will not create congestion or significant delays at the intersection of the State Highway and Arrowhead Lake Road.

29.     The Arrowhead Lake Road intersection along Route 104A is currently not considered a high crash location by the Vermont Agency of Transportation (VTrans), though it has been in the past.

30.     Eight crashes in five years have occurred at or near the intersection of Route 104A and Arrowhead Lake Road.  VTrans currently does not consider it a high crash location.  Only three accidents in the past five years have occurred at a time when the proposed quarry would be operating.

31.     Of the 15 crashes that occurred near the Arrowhead Lake Road intersection on Route 104A between 2008 and 2015, seven of them occurred at a time when the quarry would be operating.

32.     The sight distance to the proposed access road, from the perspective of westbound traffic on Route 104A, is greater than 600 feet.

33.     The sight distance to the proposed access road, measured from the perspective of eastbound traffic on the State Highway, is greater than 450 feet.

34.     VTrans' minimum sight distance is met for the westbound traffic approaching the proposed access road from the east, but not for the eastbound traffic approaching the proposed access road from the west.

35.     That section of Route 104A is curvy with slopes of up to six percent.

36.     There  are curve warning signs with 35 mph advisory speed placards posted on the eastbound side of Route 104A for the curve under the railroad underpass.

37.     VTrans has required the Applicants to maintain crash records to determine if highway safety is negatively impacted by the access road, and may require the Applicants to add traffic signals and additional turn lanes.

38. Applicants are responsible for installing and maintaining an advance warning system on Route 104A.

39. The warning system will consist of two signs, one on either side of the proposed access road along the State Highway. Each sign will have flashing lights to warn drivers that trucks are entering and exiting the highway from the access road. The lights will flash only while the gate on the access road is open.

40. VTrans and the Act 250 permit require the Applicants to examine crash records annually for five years after the quarry opens, to determine whether the access road has negatively impacted highway safety. The Applicants will provide a traffic study analyzing highway crash locations to the District #6 Environmental Commission and VTrans, which shall evaluate mitigation measures. The expense of any improvements shall be borne solely by the Applicant.

41. VTrans and the Act 250 permit require the Applicants to provide at least 100 feet between the State Highway and the Project gate on the access road to allow trucks to pull completely off the State Highway if the gate is closed.

42. VTrans and the Act 250 permit also require the Applicants to pave at least the first 100 feet of the access road, to reduce the amount of dirt, mud and gravel carried by the trucks' tires onto the State Highway.

43. The additional truck traffic is not expected to physically damage the Town of Georgia's roads or state highways.

44. The additional truck traffic is not expected to cause a hazard or detriment to the neighborhood or nearby intersections.

45. The Project site includes an unnamed tributary of the Deer Brook and two associated ponds. Class II and III wetlands are located between the two extraction areas and follow the same path as the unnamed tributary.

46. The Project site is bordered on the west by the New England Central Railroad and Harrison's Concrete Plant; to the south by Route 104A; to the east by two large parcels, one of which is owned by the Mraz Trust; and to the north by several residential properties. The surrounding area includes the Rainville Quarry and two industrial parks.

47.    The Mraz property consists of approximately 300 acres, much of which is in the state Current Use program for forestry. Hunting is allowed on the property.

48.    A residence is located on the Mraz property, approximately 3,500 feet from the boundary shared with the Project.

49.    Two nearby properties sold above the Town's assessed values for those properties after the Project had been approved at the municipal level.

50.    The site of the proposed access road is currently hilly, wooded terrain.

51.    The slope of the property closest to the State Highway, in the path of the proposed access road, has a 30 to 35% grade.

52.    When completed, the gradient of the proposed access road will not exceed 11%.

53.    In order to create a four-way intersection with Arrowhead Lake Road, the proposed access road will come within a couple of feet of the Mraz property near the State Highway.

54.    At that point, the access road will be about 40 feet below the top of the hill. The drop-off will slope to the road at a 45-degree angle. A four-foot tall chain-link fence will separate the proposed access road from the Mraz property.

55.    Construction of the part of the access road that comes within 50 feet of the Mraz property will be completed within a one to two-week timeframe.

56.    The rocky walls of the proposed access road will not be artificially stabilized.

57.    The Applicants will follow a blasting plan that includes offering pre-blast surveys to all homeowners within one-half mile of the blast area, including evaluations of structures and water quality and quantity.

58.    Forty-three wells will be included in the water quality and quantity pre-blast survey.

59.    The Applicants will provide long-term monitoring of five wells identified in the state database that are within 1,000 feet of the extraction areas and are at elevations that overlap with the extraction zone.

60.    Quarry blasting in the north and south areas will be allowed once per week between the hours of 1 p.m. and 3 p.m. on weekdays.

61.    Construction of the access road will require multiple smaller blasts that will be limited to the hours of 10 a.m. to 4 p.m. on weekdays.

62. A noise study dated June 4, 2015 was conducted by RSG of White River Junction, Vermont that determined the quarry's sound impact at neighboring residences and outdoor areas of frequent human use would be less than 55 dBA, and 70 dBA at property boundaries.

63. The noise level caused by blasting and other extraction activities at the two extraction areas is not expected to exceed 52 dBA at the closest residence.

64. When a train is passing, the background noise level exceeds 80 dBA measured in one-second intervals, or 70 dBA measured in 10-minute intervals from the proposed access road near Route 104A.

65. The noise study focused on the impacts of extraction from the two extraction areas; the study did not model the noise impacts from the access road construction.

66. Applicants propose to control dust from the extraction activities by covering all truck beds, applying water and calcium chloride on all travelled and exposed surfaces and stockpiles, maintaining a fully operational water tanker on site, periodically sweeping the paved portion of the proposed access road, and using a dust control system on rock drills.

67. The excavation sites do not contain the cover necessary to support wintering deer.

68. The excavation sites are within the 300-foot buffer for functioning deer wintering habitat to the east and north, but the impact will be minimized by closing the quarry between December 15 and April 15.

69. District #6 Environmental Commission issued Land Use Permit #6F0647 (Act 250 permit) to the Harrisons on December 18, 2015, authorizing them to operate a rock quarry and extract 1.05 million cubic yards over a 16-year period with an average annual extraction rate not to exceed 67,200 cubic yards per year.

70. The Act 250 permit was not appealed and is final and binding. It will expire on October 15, 2034.

71. The ZBA approved the Harrisons' application for a conditional use to operate a rock and sand quarry on April 25, 2016.

72. The Commission approved the Harrisons' site plan for the Project on July 27, 2016.

73.     The municipal and Act 250 permits require the Applicants to comply with conditions related to reducing the noise impact from the quarry operations, including the use of a portable barrier.

74.     Applicants are required by the Act 250 permit to reclaim the site to its preexisting condition in accordance with the guidelines outlined in Reclamation of Vermont Agricultural Soils.  Extraction in a new phase of the quarry shall not be initiated until at least 50% of the previous phase is reclaimed.

75.     Mr. Mraz appealed the ZBA's decision on May 24, 2016; he appealed the site plan approval on August 25, 2016.

76.     On January 3, 2017, VTrans approved the Harrisons' application for a permit to work within the State Highway right-of-way to construct the access road along VT Route 104A.

## Conclusions of Law

Mr. Mraz's Statement of Questions in the appeal of the ZBA's decision to issue the Applicants a conditional use permit for a rock and sand quarry contains four questions:

1. Will the proposed development create an undue adverse impact on the character of the neighborhood or the area?
    a. Will the proposed development create a nuisance or hazard to the detriment of the health, safety, or welfare of the intended users, neighbors or the citizens of the Town of Georgia?
    b. Will the proposed use be compatible with the purposes of the district and the character of the surrounding neighborhood and not unduly detract from abutting residences or other property?
    c. Will the appropriate use or development of adjacent property be impeded by the proposed development?
2. Will the traffic generated or patterns of ingress or egress by the proposed development cause congestion, hazard or detriment to the neighborhood or nearby intersections?
3. Will the removal of earth resources cause a hazard to property values?
4. Will the removal of earth resources cause traffic hazards or excessive congestion or physical damage to Town or State highways on the expected routes of truck traffic?

Pl.'s Statement Questions, No. 49-15-16 (filed June 15, 2016).

The Appellant's Statement of Questions in his appeal of the Commission's site plan approval contains one question: "Will the removal of earth resources cause traffic hazards or

excessive congestion or physical damage to Town or State highways on the expected routes of truck traffic?" Pl.'s Statement Questions, No. 95-8-16 (filed Sept. 13, 2016).

Both Statements of Questions included a question pertaining to the Letter of Intent from VTrans related to the proposed access road. That question is moot because VTrans issued Applicants a permit to work within the State Highway right-of-way to construct the access road along Route 104A.

## I.      Standard and Scope of Review

These coordinated appeals call for the Court to determine whether Applicants are entitled to a conditional use zoning permit (Docket No. 49-5-16 Vtec), and whether the proposed project conforms to the applicable site plan provisions for earth resources extraction as defined in the Regulations (Docket No. 95-8-16 Vtec). While we conduct our review of the pending applications on a de novo basis, pursuant to 10 V.S.A § 8504(h), we limit our review to the issues that have been presented by an applicant through the statement of questions. Id.; see also V.R.E.C.P. 5(f).

Additionally, this Court's jurisdiction, or scope of review, is limited to the issues presented in statements of questions filed by appellants. In re Atwood Planned Unit Dev., 2017 VT 16, ¶ 12 (citing In re Garen, 174 Vt. 151, 156 (2002)). The purpose of this procedure is to give the opposing party and the court notice of the issues to be tried. Id. at ¶ 14.

### Conditional Use Review

A sand and rock quarry is considered an "earth resource extraction" under the Town's Regulations, and is allowed as a conditional use in the AR-1 zoning district. See Regulations Table 2.2. As such, quarries are subject to both general standards for conditional uses, see id. § 3.2, and specific standards for earth resource extraction facilities. See id. § 6.3.

   a. *Will the proposed development create an undue adverse impact on the character of the neighborhood or the area? (Question 1)*

The Appellant asks whether the proposed development will create an undue adverse impact on the character of the neighborhood or the area.

Among the Town's requirements for a conditional use permit is that:

The use will not create an undue adverse impact on the character of the neighborhood, area, or district affected and that:

    a.  A nuisance or hazard will not be created to the detriment of the health, safety, or welfare of the intended users, neighbors, or the citizens of the Town;

    b.  The proposed use or building and the relationship between the buildings and the land will be compatible with the purposes of the district and the character of the surrounding neighborhood and will not unduly detract from abutting residences or other property; and

    c.  Appropriate use or development of adjacent property will not be impeded. The Board will consider the scale of the proposed development in relation to existing and proposed uses and buildings, and the effect of the proposed use on the continued enjoyment and access to existing and approved uses in the vicinity of the proposed use.

Regulations § 3.2(B)(2), (a)–(c).

1.   Defining Character of the Area

The enabling state statute allows towns to approve conditional uses so long as those uses do not result in an undue adverse effect on "[t]he character of the area affected, as defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the municipal plan." 24 V.S.A. § 4414(3)(A)(ii). The state law sets the "floor" for municipalities' conditional use regulations. Rublee 246 White Birch Lane CU, No. 140-11-15 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. Aug. 23, 2016) (Walsh, J.). Towns are free to also require that conditional uses do not have an undue adverse effect on the character of the area as it actually exists. Id.

In this case, the Town's Regulations require that we consider the Project's impact on the neighborhood as it exists. The conditional use must not "create an undue adverse impact on the character of the neighborhood, area, or district affected." Regulations § 3.2(B)(2). Parts (a), (b), and (c) of Section 3.2(B)(2) further direct the Court to consider the potential impact of the Project on specific aspects of the existing area, to ensure it will not create a nuisance or hazard to the deteriment of the health, safety, or welfare of intended users, neighbors or Town citizens; that it will not unduly detract from abutting residences or other property; and that it will not impede the appropriate use or development, or the continued enjoyment, of adjacent property. We are

-11-

also directed to the purpose or purposes of the zoning district and the existing land uses by both state law and the Town's bylaws. 24 V.S.A. § 4414(3)(A)(ii); Regulations § 3.2(B)(2)(b) ("The proposed use or building and the relationship between the buildings and the land will be compatible with the purposes of the district . . . ."). "Character of the area" in the Town of Georgia is defined by zoning district purpose statements, specific policies and standards for the zoning district in the Town Plan, and by existing development in the neighborhood where the Project is located.

### 2.  Definining Undue Adverse Effect or Impact

"Undue adverse effect" is the statutory standard by which we must measure a development's impact on the character of the area. 24 V.S.A. § 4414(3)(A). The state standard is echoed in the Town's Regulations as an "undue adverse impact." Regulations § 3.2(B)(2). In considering this standard, we are guided by the definition of undue adverse impact found in the two-pronged Quechee test used in reviewing state land use (Act 250) permits. See In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶¶ 12, 14, 195 Vt. 625 (approving use of the Quechee test as guidance in defining undue adverse impacts in zoning bylaws). Under the Quechee test,

> "[the Court first] determines if the proposed project will have an adverse . . . impact, and if so, it considers whether the adverse impact would be undue. An adverse impact is considered undue if <u>any one</u> of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard . . . ; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings."

In re Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336 (citations omitted).

### 3.  Analysis

Step One of our analysis requires us to determine what the character of the area is, as defined by the purpose or purposes of the zoning district in which the Project is located and specifically stated policies and standards of the municipal plan. The Project is in the Agriculture/Rural Residential District, or the AR-1 zoning district. According to the Regulations, the primary purpose of the AR-1 district is to provide a place for agriculture and silviculture uses. Regulations § 2.1(A)(1). This same purpose of the AR-1 district is repeated in Section 6(B) of the

municipal plan: "Residential and other uses permitted in the district should be very low density and should not interfere with the agricultural and rural nature of the district." Regulations § 2.1(A)(1).; Town Plan 85. Additionally, "land should be developed so that large contiguous expanses of agricultural, forestry, significant geological areas, wildlife habitat, scenic areas, and other important open space land will be protected." Id.

The purpose statements for the AR-1 district in both the Regulations and the Town Plan conspicuously do not mention steep slopes, which are referenced in the description of the Recreation District ("The Recreation District has severe limitations for development, including steep slopes . . . .") and the Lakeshore District ("There are some severe limitations on development in this district due to soil conditions and slopes and thus densities in the district should be low."). Regulations § 2.1(A)(8) and (11).[1]

Step Two of our analysis takes us to the first prong of the Quechee test, to determine whether the Project will have an adverse impact on the character of the area as defined in the zoning district's purpose statement. As a sand and rock quarry, the proposed Project is not an agriculture nor a silviculture use and so does not meet the primary purpose of the zoning district. Quarries, however, are common to Vermont's rural areas. Indeed, siting quarries in rural areas is far preferable to siting them near residences and town centers. Moreover, the quarry itself will be buffered within the Project site, which will protect the rural nature of the district. Applicants intend to develop only one-quarter of the Project's 103.5 acres. With these factors in mind, the Court finds that the Project will not interfere with the rural nature of the district. The Court also finds the Project will not interfere with the district's agricultural nature, because the Project site is hilly and rocky, and not suitable for farming.

Because the Court finds the Project will not interfere with the primary purposes of the AR-1 zoning district, and because quarries are allowed as conditional uses in the district, the Court concludes that the Project will not have an adverse impact on the character of the area affected as defined by the purpose or purposes of the AR-1 zoning district, and specifically stated policies

---

[1] In considering the character of the area review established pursuant to 24. V.S.A. §4414(3)(A)(ii), we look to provisions within the municipal plan that are specific to the purpose of the zoning district at issue. We do not look generally for clear, written community standards throughout the municipal plan as is done within the second "undue"prong of the Quechee test.

and standards of the Town Plan.  Since the Project will not have an adverse effect, we do not reach the second prong of the Quechee test.

Mr. Mraz argues that the Project has an undue adverse impact on the character of the area because it violates a clear, written community standard that prohibits development on steep slopes.  Mr. Mraz cites Section 2(F-5) in the Town Plan, which states that "[i]ntensive land development on slopes in excess of 25% shall be prohibited and every effort shall be made to maintain a suitable cover of natural vegetation to reduce erosion."  Again, because we conclude there is no adverse effect, we do not reach the issue of "undue" and therefore we no not look for clear, written community standards within the municipal plan.

Next, we determine the character of the area as defined by the neighborhood as it exists and apply the same methodology.  Step One is to determine what the existing uses are in the surrounding area.  The Project's neighborhood includes the Rainville Quarry and two industrial parks.  The Project is bordered on the west by the New England Central Railroad and Harrison's Concrete Plant; to the south by Route 104A; to the east by two large parcels, one of which is owned by the Mraz Trust; and to the north by several residential properties.  Step Two is to determine whether the Project will have an adverse impact on the character of the area as it exists.  Based on the predominate development in the surrounding area, including industrial sites and a quarry, the Court concludes that the Project will not have an adverse impact on the character of the area as it exists.  Because we find that the Project will not have an adverse impact, we do not need to determine whether the adverse effect is undue and thus do not reach the second prong of the Quechee test.

b. *Will the proposed development create a nuisance or hazard to the detriment of the health, safety, or welfare of the intended users, neighbors or the citizens of the Town of Georgia? (Question 1.a.)*

Mr. Mraz contends the construction of the access road, and the associated extraction activity, will create excessive noise,[2] causing a nuisance; and the road will come within two to three feet of his property and create a 30-to 40-foot drop-off, a hazard.  He further claims that

---

[2] Road construction will require multiple blasts each day.  These blasts, however, are expected to be smaller than the one-blast-per-week allowed at the excavation sites.

the Applicants should have performed impact studies on the access road, because they intend to extract about 75,000 cubic yards of aggregate from its path, creating what in effect could be considered a third extraction area.

The Court rejects these claims. First, the access road is not part of the proposed quarry. It was only added to the Project after the original access road—the existing Skunk Hill Road—was rejected by the Town. The fact that the Harrisons intend to make use of the material extracted during road construction does not change its purpose. Road construction activities are exempt from the performance standards, which prohibit noise "in excess of 70 decibels at the property line or a noise which is considered offensive." Regulations § 5.6(A). The performance standards apply to the "proposed use or present operation" of the land, which we read as the ongoing use of the land and not temporary construction activities. Id. § 5.6. Notwithstanding this, the Applicants plan to employ a portable screen and other standard noise mitigation measures during road construction that should prevent the noise from exceeding 70 dBA at the Mraz property line, except for one to two weeks when the work occurs within 50 feet of the Mraz property.

Second, the drop-off will not create a hazard because a four-foot-tall fence will separate it from the Mraz property. Those most likely affected are hunters who use the Mraz property. Even in the dark, a hunter would not be able to inadvertently walk off the drop-off without knowingly trespassing by climbing the fence. To add further protection to hunters or others who may enter the area, we add the condition that warning signs be added to the fence every 100-feet alerting that a quarry and steep drop-off are in the area.

The Court concludes that the proposed development will not create a nuisance or hazard to the detriment of the health, safety, or welfare of the intended users, neighbors or the citizens of the Town of Georgia because road construction is a temporary activity and a fence will prevent people from falling into the access road.

c. *Will the proposed use be compatible with the purposes of the district and the character of the surrounding neighborhood and not unduly detract from abutting residences or other property? (Question 1.b.)*

The first part of this question was answered above, in Part II. a. The proposed use will be compatible with the purposes of the AR-1 district and the character of the surrounding

neighborhood.  For the second part of the question, Mr. Mraz claims the proposed access road, with its 30- to 40-foot dropoff adjacent to his property, will unduly and significantly detract from his property.  The Court also rejects this claim.

The Mraz property consists of approximately 300 acres, much of which is in a forestry management plan and is part of the state's Current Use program for forestry.  The one house on the property is located approximately 3,500 feet from the proposed Project site.  The property contains a deer wintering area.

The Applicants will mitigate the impacts of the quarry by following a blasting plan, which will limit blasting required for construction of the access road to the hours of 10 a.m. to  4 p.m. on weekdays.  The Applicants also plan to use noise mitigation measures.  Additionally, only one-quarter of the Project site will be developed, leaving a sizable buffer between most of the excavation work and the Mraz property.

Additionally, any impact to the deer wintering area on the Mraz property and other properties will be minimized or eliminated by closing the quarry between December 15 and April 15.

Due to the remote nature of the Mraz property, the buffer around the quarry and much of the access road, the Court concludes that the uses on the proposed Project are compatible with the Mraz property and will not unduly and significantly detract from his property.

> d. *Will the appropriate use or development of adjacent property be impeded by the proposed development? (Question 1.c.)*

Like the Project site, the Mraz property is in the AR-1 zoning district, where any residential or other uses "should be very low density and should not interfere with the agricultural and rural nature of the district."  Regulations § 2.1(A)(1).  The Mraz property consists of approximately 300 acres, much of which is in a forestry management plan and is part of the state's Current Use program for forestry.  A residence on the property is located approximately 3,500 feet from the proposed Project site.  None of these uses are incompatible with the proposed Project, and the Regulations serve to limit what Mr. Mraz may be able to do with his property in the future, since they discourage development that would alter the rural nature of the zoning district.  Id.

Residential and other uses should be very low density; strip development is not allowed; and the land should be developed to maintain large contiguous expanses of open space for forestry, agricultural, significant geological features, wildlife habitat, and scenic areas. Id.

For all these reasons, the Court concludes that appropriate use or development of the Mraz property will not be impeded.

e. *Will the traffic generated or patterns of ingress or egress by the proposed development cause congestion, hazard or detriment to the neighborhood or nearby intersections? (Question 2)*

The Regulations provide that "A permit will be granted only upon a finding by the ZBA that the following standards . . . have been met: Traffic generated or patterns of ingress or egress will not cause congestion, hazard or detriment to the neighborhood or nearby intersections." Regulations § 3.2(B) and (B)(3). A specific requirement for the commercial removal of rock, sand, gravel or similar material is that the "removal will not cause any traffic hazards or excessive congestion . . . ." Id. § 6.3(A)(6).

VTrans requires minimum sight distances on roads with a posted speed of 50 mph of 555 feet at intersections, unless otherwise approved by VTrans. Standards for Residential and Commercial Drives, Standard B-71, Ex. Q. Advance warning systems are required if intersection sight distances are not met. Id.

The Appellant does not claim that the 50 to 100 truck trips per day generated by the Project will cause congestion. Instead, the Appellant claims the traffic entering and exiting the proposed access road will create a hazard for vehicles traveling along VT Route 104A due to limited sight lines caused by the curves in the highway and a hill.

VTrans' minimum sight distance is met for the westbound traffic approaching the proposed access road from the east, but not for the eastbound traffic approaching the proposed access road from the west. According to the Appellant's traffic expert, the sight distance to the proposed access road, from the perspective of westbound traffic on Route 104A, is 636 feet for a passenger car or light truck, and 653 feet for a large truck. Technical Mem., Ex. 2. The sight distance to the proposed access road, measured from the perspective of eastbound traffic on the State Highway, is is 453 feet for a passenger car or light truck, and 460 feet for a large truck. The

Appellant's traffic expert also asserts that there is not adequate sight distance in either direction for trucks exiting the quarry.

As a requirement of their permit to work in the State Highway right-of-way to construct the access road, the Applicants will install advanced warning systems along Route 104A. Signs that read "Trucks Entering Highway" with flashing lights will be positioned along the state route, one on each side of the proposed access road, 400 feet from the intersection. The lights will flash automatically when the access gate is open. The Applicants also propose lining up the access road directly across from Arrowhead Lake Road to create a four-way intersection rather than two "T" intersections in rapid succession, to reduce the potential for conflict. Additionally, there are curve warning signs with 35 mph advisory speed placards posted for the curve under the railroad underpass for the eastbound traffic.

Mr. Mraz's traffic expert claims the warning lights will not be sufficient to prevent unsafe conditions caused by the inadequate sight distances at the proposed access road.

The Court finds that the early warning system, coupled with the existing curve warning signs, is sufficient to mitigate against the sight distances at the proposed access road. With those offsetting measures, the Project will not create hazardous traffic conditions.

f. *Will the removal of earth resources cause a hazard to property values? (Question 3)*

The Regulations provide that the commercial removal of rock, sand and other material may be permitted as a conditional use by the ZBA if "[t]he removal will not cause any hazard to health, property, or property values." Regulations § 6.3(A)(1).

The Applicants provided evidence that two nearby properties sold above the Town's assessed value for those properties after the Project had been approved at the municipal level. The Appellant did not rebut this evidence, nor provide countervailing evidence.

The Court concludes that the proposed Project will not cause a hazard to property values in the area.

g. *Will the removal of earth resources cause traffic hazards or excessive congestion or physical damage to Town or State highways on the expected routes of truck traffic? (Question 4)*

The Regulations provide that the commercial removal of rock, sand and other material may be permitted as a conditional use by the ZBA if "[t]he removal will not cause any traffic hazards or excessive congestion or physical damage to Town or State highways on the expected routes of truck traffic." Regulations § 6.3(A)(6).

The Court addressed traffic hazards in Part II. e. The Appellant has stated that traffic congestion is not one of his concerns. The only question left is whether the truck traffic generated by the Project will physically damage the local and state roads.

The proposed access road will funnel the truck traffic through Route 104A, a state highway, rather than Skunk Hill Road, a town road. The Applicants offered that state highways are maintained and built to a higher standard than local roads, and that the truck traffic generated by the Project would not damage the roads. The Appellant did not rebut this assertion. In addition, the Applicants plan to pave at least the first 100 feet of the proposed access road from the state highway, which should serve to limit mud and gravel being carried by truck tires onto Vt Route 104A.

The Court concludes that the truck traffic generated by the Project will not cause any physical damage to the roads.

## II. Site Plan Approval

In appealing the Commission's site plan approval, Mr. Mraz repeated the preceding question: whether the removal of earth resources will cause traffic hazards or excessive congestion or physical damage to Town or State highways on the expected routes of truck traffic.

The issues raised in this question were answered in Part II. e. and g.

## III. Conclusion

The Project will not create an adverse impact on the character of the neighborhood or the area; it will not create a nuisance or hazard to the detriment of the health, safety, or welfare of the intended users, neighbors or the citizens of the Town of Georgia; it is compatible with the

purposes of the district and the character of the surrounding neighborhood and will not unduly detract from abutting residences or other property; and it will not impede the appropriate use or development of adjacent property. Additionally, the traffic generated by the Project will not cause congestion, hazard, or detriment to the neighborhood or nearby intersections; the generated traffic will also not cause excessive traffic hazards or excessive congestion or physical damage to Town or state highways; and the removal of earth resources extraction will not cause a hazard to property values.

The applications for conditional use approval and site plan approval are therefore **GRANTED.** We **REMAND** the conditional use approval to the Town Zoning Administrator solely for the ministerial act of issuing a new approval consistent with this decision and subject to the 31 conditions detailed in the Town of Georgia ZBA's Findings and Decision on the Harrisons' Application for Conditional Use, dated April 25, 2016, along with the additional condition that warning signs be added to the four-foot perimeter fence every 100-feet alerting hunters and others using the Mraz property to the quarry and steep drop-off.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court.


Electronically signed on June 16, 2017 at 02:57 PM pursuant to V.R.E.F. 7(d).


_Tom Wash_
_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division