STATE OF VERMONT

SUPERIOR COURT                                   ENVIRONMENTAL DIVISION
                                                    Docket No. 31-3-18 Vtec

| | |
|---|---|
| Wright & Boester Conditional Use<br> Application Appeal | |

## Decision on the Merits

Caspian Lake in the Town of Greensboro, Vermont, offers some of the most idyllic and tranquil settings in our State. There are a number of homes along the Caspian shoreline, mostly seasonal but some year-round. Many homes are modest and of an architectural design from many years ago; not many homes along the shoreline could be identified as architecturally modern. It is within this context that we are asked to evaluate a plan by certain homeowners to reconstruct an accessory structure on their property adjoining the Caspian shoreline.

Marian Wright and Greg Boester ("Applicants" or "Appellants") own property along the Caspian Lake shoreline, located at 151 Birch Lane. Their property hosts a single-family residence and an accessory structure along the Lake shoreline that is used to store canoes, kayaks, and related equipment on its basement level, with a second level that has been used as a storage and living space. They sought conditional use approval to reconstruct their shoreline accessory structure on the same or similar footprint, increase the height of the structure by ten feet and add a second level of living space. The Town of Greensboro Development Review Board ("DRB") approved their conditional use application on February 9, 2018, but the DRB placed several conditions on the approval, some of which the Applicants did not appreciate. So, Applicants filed a timely appeal from that DRB decision with this Court.

Neighboring property owners Day Patterson, Janet Showers, and Philip Patterson ("Neighbors") have appeared as Intervenors in this matter. The Town of Greensboro ("Town") is also a party to this appeal.

Applicants are represented in this matter by Anthony N.L. Iarrapino, Esq. Neighbors are represented by Christopher Roy, Esq. The Town is represented by Sara E. Davies Coe, Esq.

**Procedural History**

The parties made several efforts to voluntarily resolve their legal disputes, including by engaging a mediator to assist with their negotiations. When all those efforts did not result in a full resolution of their dispute, the Court thanked the parties for their efforts and scheduled this matter for trial. The trial eventually took place over two consecutive days, beginning on October 8, 2019, at the Lamoille Superior Courthouse in Hyde Park, Vermont. When the trial was completed, the parties requested an opportunity to submit Proposed Findings of Fact and Conclusions of Law. When those filings were completed on December 23, 2019, this matter came under advisement. Other responsibilities have frustrated the assigned judge's efforts to complete the research and drafting for this Merits Decision, for which the undersigned offers his apologies to the parties and their attorneys.

At the request of the parties, the Court conducted a site visit on July 24, 2019.

While this matter awaited trial, the parties filed several pretrial motions. We reference here only the Decision on the cross-motions for summary judgment, since it impacts upon our final determinations.

In our March 28, 2019 Decision addressing the parties' cross-motions for summary judgment, we answered Appellants' Question No. 1 in the affirmative by concluding that the structure at issue more properly fit within the term "accessory structure" and not "boathouse," as those terms are defined within the Town of Greensboro Zoning By-Law ("Bylaws"). See Bylaws §§ 8.4, 9.2. This determination resolved the legal issues raised by Appellants in their Question 1 and had an initial impact upon what provisions governed our remaining review of their proposed redevelopment, since a boathouse is only allowed in the Shoreland Protection Zoning District as a conditional use, whereas accessory structures are allowed as permitted uses in that District. *Compare* Bylaws § 2.7(D)(1) *with* Bylaws § 2.7(C)(2). This pre-trial determination overruled the DRB's determination that the Structure should be regarded as a boathouse. *See* In re Wright & Boester CU Application, minutes of Jan. 29, 2018 Hearing at 4 (Greensboro Dev. Rev Bd., approved Feb. 9, 2018) [hereinafter "DRB Decision"] (admitted at trial as Town Exhibit E).

The DRB also concluded that the increase in height of the Structure that Applicants proposed (i.e.: an increase of 10 feet, thereby bringing the proposed height of the roof peak to

2

29.5 feet) <u>did not</u> increase the Structure's degree of non-conformity, but that the increase in height would bring about "an undue adverse effect on the character of the area."[1]  <u>Id</u>. at 3, 2 (first citing Bylaws § 8.9; then citing Bylaws § 5.4(B)(2)).  Similarly, the DRB concluded that the increased height of the proposed renovated structure "is not compatible with other structures in the area."  <u>Id</u>. at 2 (citing Bylaws § 5.4(C)(5)).

In our March 28, 2019 Decision, we noted that no party appealed the DRB's determination that the increased height of the proposed structure <u>did not</u> increase its degree of non-conformity. Therefore, that determination was final and cannot now be challenged in this appeal.  *See* <u>In re Wright & Boester CU Appeal</u>, No. 31-3-18 Vtec, slip op. at 9 (Vt. Super. Ct. Envtl. Div. March 28, 2019) (Durkin, J.) (citing <u>Vill. of Woodstock v. Bahramian</u>, 160 Vt. 417, 424 (1993)).

By their Question 2, Appellants challenged the adverse conditional use finding concerning impact upon the area but did not specifically cite to the adverse finding that the increased height was not compatible with other structures in the area.  <u>Wright & Boester CU Appeal</u>, No. 31-3-18 Vtec at 9 n.4 (March 28, 2019).  We concluded that these issues were so intertwined that Question 2 could be properly interpreted to include a challenge to the finding concerning incompatibility with other area structures.  <u>Id</u>. (citing <u>In re Jolley Assocs.</u>, 2006 VT 132, ¶ 9, 181 Vt. 190) (directing that "[t]he literal phrasing of the question cannot practically be considered in isolation from the zoning administrator's action that prompted the appeal").  We therefore afforded Appellants an opportunity to file an Amended Statement of Questions, to include a Question that specifically cited to the language concerning incompatibility with other area structures.[2]  Appellants filed their Amended Statement of Questions on April 5, 2019.

---

[1]  Consideration of whether a proposed structure may cause "an undue adverse effect on the character of the area" is a determination that must be made for structures or uses that are only allowed as conditional uses.  See Bylaws §§ (§ 5.4(B)(2).  No such consideration is required under the applicable Bylaw provisions that govern permitted uses; an accessory structure is a permitted use.  See Bylaws § 2.7(C)(2).  However, this distinction has become merely academic, as our legal analysis below shows, because Applicants are seeking to modify a nonconforming structure.  A nonconforming structure may only be "restored or reconstructed" if it receives conditional use approval.  Bylaws § 3.8(A)(2).

[2]  Appellants' original Question 2 quotes the language from Bylaws § 5.4(B)(2) concerning undue adverse impact upon the character of the area, but does not specifically cite to that Bylaw provision, nor does it cite to Bylaws § 5.4(C)(5) concerning incompatibility with other area structures.  Appellants' Amended Statement of Questions includes a new Question 3, which specifically cites to and quotes Bylaws § 5.4(C)(5).

We recognize that "[u]ntil final decree the [trial] court always retains jurisdiction to modify or rescind a prior interlocutory order." Kelly v. Town of Barnard, 155 Vt. 296, 307 (1990) (quoting Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118, 1121 (10th Cir. 1979)). However, no facts or legal arguments received during our trial caused the Court to reconsider and change the determinations announced in our March 28, 2019 Decision. We therefore incorporate those legal determinations here by reference.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

## Findings of Fact

### A. Existing Accessory Structure

1. Marian Wright and Greg Boester own property located at 151 Birch Lane in Greensboro, Vermont ("the Property"). The Property adjoins the Caspian Lake ("the Lake") and abuts the lot owned by Day Patterson and Janet Showers, which is located to the north and east. The parties' properties are located on a small peninsula known as Black's Point.

2. Applicants' Property is located on the southwesterly tip of Black's Point and has shoreline frontage on its southerly and westerly boundaries.

3. Their Property includes a main house, a shed, and a two-story lakeside accessory structure ("the Structure") which serves to store small canoes, kayaks, and related equipment. The structure also has a living space on its second floor that includes a bathroom, a shower, and open living area.

4. The Structure is 18 feet and 5.5 inches long, 16 feet and 4 inches wide, and 19 feet, 8 inches tall. The Structure is about 8.5 inches from its easterly boundary at its nearest point. Its location is depicted on Applicants' Exhibit 7.

5. The southerly side of the Structure faces Caspian Lake. It is about 18 inches from the mean water level of the Lake, as defined in Bylaws § 8.4. This setback does not conform to the current requirements for setbacks from shorelands, as defined in Bylaws § 8.4, Figure 4A.

6. The lower level of the Structure has a gravel floor and the internal walls are unfinished. This is where one or more canoes, kayaks, and related equipment are stored. This lower level

4

has an interior height of eight or more feet.  It includes two doors which lead to an adjoining wooden dock that extends onto the Lake.

7.      The southeasterly corner of the Structure is within several inches from its easterly boundary line.  A portion of the dock that extends from the southerly face of the Structure, over land for about 18 inches, and then onto the Lake, may encroach onto the neighbors' property by a couple of inches.

8.      The Structure's upper level is accessed by an external door on the side nearest the circular turn around, facing away from the Lake.  There are three rooms and a short hallway on this level; one of the rooms contains an operational toilet and sink and another room contains a shower.  The third room is an open area, with windows facing the Lake; this larger room is used for additional living space and storage of household items, such as furniture, arts and crafts supplies, and tools.

9.      The Structure has a functioning septic system, which was inspected in 2017 by Grenier Engineering, P.C. The septic system will remain in place to serve the reconstructed Structure.  John Grenier, Engineer, advised that proposed renovations to the Structure would not increase flow, as "the structure will continue to have one bedroom and one bath." *See* Applicants' Exhibit 8, at 8.

10.     While the Structure presents itself as a two-story structure when viewed from the Lake, it presents itself as a one-story structure when viewed from the circular drive.

11.     Applicants' property hosts a number of cedar, birch and other trees, and some undergrowth.  The neighboring properties include similar trees and vegetation.  When viewed from the Lake, these properties appear to be mostly wooded, with some clearings near the existing buildings. *See* Applicants' Exhibit 3.

12.     The Structure is in the Town's Shoreland Protection Zoning District ("Shoreland District").  See Bylaws § 2.7(A).  The Structure does not conform with the current side, rear, and lakefront setbacks for this District. *See* Bylaws § 2.7(E).

13.     On December 20, 2017, Appellants submitted an application for a "Conditional Use Permit/Variance for Reconstruction or Relocation of Nonconforming Structures [sic] in the

Shoreland Protection District."  The application proposed to reconstruct the Structure on its existing footprint, and to add a third level to the Structure, increasing its height by 10 feet.

14.     On February 9, 2018, the DRB issued a decision approving the conditional use permit application with conditions.  The DRB denied the application with respect to the third level, and approved reconstruction of the Structure on its existing footprint to its existing height.

15.     The DRB specifically found that the "rebuilt structure will be built on the existing nonconforming footprint and will not increase the degree of nonconformity."  DRB Decision at 3 (emphasis added).  However, the DRB also found that the proposed height with the addition of a third level would have an undue adverse effect on the character of the area and would not be compatible with other structures in the area, as required by the Bylaws.  Id.

16.     Appellants filed a timely appeal of the DRB decision to this Court.  No other party appealed the DRB decision.

### B.  Proposed new structure, as presented at trial

17.     At trial, Applicants submitted a revised reconstruction plan, a copy of which was admitted at trial as Applicants' Exhibit 4.  The revised plans reduce the height of the basement boat storage area to a crawlspace with about 4 feet of interior height.  The revised reconstruction plans continue to include a third floor, but the total exterior height of the new Structure would be reduced by three feet compared to the earlier proposal, bringing it to a total height of 26.5 feet, as measured from the lowest level of the ground at the building's base to the peak of the roof. The new Structure would therefore be seven feet higher than the existing Structure, but 3.5 feet lower than the maximum height allowed by the Bylaws.[3]  *See* Bylaws § 2.7(E).

18.     The reconstructed Structure will also be shifted slightly, by about several inches, so that its southeasterly corner will be moved slightly away from the Property's easterly boundary line, which will result in the reconstructed building being nearly parallel to Applicants' easterly

---

[3] The Bylaws direct that the height of buildings is to be calculated as "[t]he vertical distance measured *from the average finished ground elevation* around the foundation to the top of a structure or to the highest point of the roof surface of a building."  Bylaws § 9.2 (emphasis added).  Since the Structure sits on land that slopes towards the Lake, Applicants' initial height calculations are taller than that directed by the Bylaw.  Applicants advised that, when following the Bylaws directive, the actual height is about 3 feet lower.  Given that either calculation results in a height below the Bylaw maximum of 30 feet, we conclude that the different calculation does not have a material impact upon our factual Findings or Legal Conclusions.

boundary. Applicants advised that they made this revision to respond to concerns by the adjoining property owners that the wooden dock attached to Applicants' Structure may be on or slightly over their boundary line.

19.     Initially, the proposed Structure had a shed-style roof. In response to some of Neighbors' concerns, Applicants modified their plans to incorporate a gabled roof, with the roof peak running north to south, and with shallow dormers on the east and west sides. This revision in roof style more closely aligns with the eclectic style of the roofs on buildings that adjoin the Lake.

20.     The Structure's exterior will now be stained or painted to align with the exterior colors of the Applicants' adjoining home. This color scheme will allow the reconstructed Structure to blend more evenly to other adjoining buildings, trees, and vegetation.

21.     It will also include larger windows facing the Lake and several more windows than are now on the existing structure. See Applicants' Exhibit 3, which is a demonstrative Exhibit that provides a comparison of the view from the Lake of the existing Structure and the proposed reconstructed Structure. See also Neighbors' Exhibit Z, which is a three-dimensional model of the existing and revised proposed Structures prepared by Ms. Showers, using Applicants' site plan drawings (Applicants' Exhibit 4).

22.     The reconstructed Structure will also be pushed back three feet further from the Caspian shoreline, thereby reducing its nonconformity with that Bylaw setback requirement. This slight revision was made in response to concerns expressed by the Neighbors and the Town. *See* Applicants' EPSC Plans & Details (admitted at trial as Applicants' Exhibit 5).

23.     Applicants' Exhibit 5, prepared by John P. Grenier, Engineer, also includes details on erosion and sediment control during construction and thereafter, including the use of geotextile filter curtains, detailed limits of disturbance, and final tree plantings and vegetation. These plans show that the proposed reconstruction will not cause undue erosion and will protect the surrounding areas.

24.     The footprint of the proposed Structure will remain the same width and depth as the existing Structure, although it will be rotated slightly so that its southeasterly corner will be moved away from the boundary line shared with its easterly neighbor, thereby increasing, slightly, the setback from that side boundary. This rotation of the building will also afford more

room for the tree plantings, discussed below, that are proposed as part of a landscaping mitigation measure. Id.

25.     Applicants propose to plant and maintain two cedar and two birch trees along the southerly and westerly sides of the proposed structure, to help mitigate the visual impacts of the proposed structure. The existing birch and other trees will be protected during construction and maintained on the property. Id.

26.     As noted above, Applicants' property hosts a number of existing cedar, birch and other trees, and some undergrowth. None of these trees or undergrowth will be removed or disturbed by the proposed reconstruction.

27.     There are no buildings on the nearby properties whose existing views of the Lake will be obstructed if the revised reconstruction plan is completed, even when its height is increased by 7 feet over the existing structure.

28.     The existing and reconstructed Structures is and will be set in front of and flanked by a backdrop of deciduous and coniferous trees, most of which are substantially taller than the existing or proposed Structure. Therefore, when the Structure is viewed from the Lake, or elsewhere, a dense backdrop of foliage will still be visible and will partially obscure a view of the reconstructed Structure. *See* Applicants' Exhibit 3.

29.     Because the proposed Structure will be moved back from the Lake shoreline, a fiberglass ramp will be installed on the ground from the Lake-side crawlspace doors to the shoreline, so as to protect from erosion and allow ease of access. The two birch trees to be planted on the southerly side of the structure will provide added screening for this ramp. Id.

## C. Existing Lakeshore Development

30.     The parties to this litigation own properties on the section of Caspian Lake shoreline known as Black's Point, which is in the northeasterly quadrant of the Lake and projects westerly into the Lake. Due to the shape of Black's Point, it affords its property owners shorelines that face north, south, and west. *See* Neighbors' Exhibit B-3.

31.     Neighbors own and occupy two separate parcels that either adjoin or are close to Appellants' property. Day Patterson and Janet Showers (collectively, "the Patterson/Showers") own an inverted "L-shaped" lot that adjoins Appellants' property to the east and north. The

8

Patterson/Showers property is improved with a single-family residence and accessory structure and has easterly and southerly frontage on the Black's Point shoreline. Its street address is 146 Birch Lane. Id.

32.     The Patterson/Showers home is located northerly of Applicants' existing Structure. Due to the trees and other natural growth on both lots, the existing Structure is not visible from the Patterson/Showers' home. In fact, due to the height and density of the existing trees and undergrowth, even the reconstructed Structure will not be visible from the Patterson/Showers' home.

33.     Neighbor Philip Patterson (also an Intervenor) owns property located at 127 Birch Lane; that property is also improved with a single-family residence but has no accessory structures. Philip's property does not abut Applicants' property; his home does not afford a direct view of the existing Structure, nor will it afford a view of the proposed new Structure. Id.

34.     Neighbors' Exhibit B-3 was created by Neighbor Janet Showers, who overlaid the road numbers for each property over a lot map that details the properties on Black's Point. The numbers on Exhibit B-3 that are in bold font denote a property that contains an accessory structure or boat house; the properties with faded numbers do not.

35.     All of these parties' properties are in the Shoreland District and are accessed by the private road known as Birch lane. This road ends at a circular turn around that is located primarily on the Patterson/Showers property; a small portion of the turnaround is on Applicants' property. The turnaround thereby serves all three properties within a small cluster of homes.

36.     Someone using this turn around will pass in front of Applicants' existing Structure and will be able to view it. Similarly, someone seeking to walk from the Patterson/Showers' property to the Caspian shoreline will likely see Applicants' Structure as they walk along an established path that parallels Applicants' Structure.

37.     The circular turn around is in a cleared section of the parties' properties, with some vegetation within the circle. Each of the properties have well-established trees and other ground growth that provide partial screening between the homes and accessory structures.

38.    The Caspian shoreline is an enjoyable place to walk.  In fact, many homeowners and visitors walk along an established path along the shoreline.  Those path visitors will be able to see Applicants' Structure as they walk past and over Applicants' property.

39.    Caspian Lake is also a wonderful place to boat, canoe, and kayak, as well as cross country ski in the winter months.  Many homeowners and visitors enjoy these Lake activities.  Those who are on the Lake in the proximity of Black's Point will be able to view Applicants' home, Structure, and nearby properties.

40.    Applicants' expert, Milford B. Cushman, presented a composite of photographs depicting the properties along the southerly shoreline of Black's Point, including aerial and Lake-based photos of the Patterson/Showers' property, Applicants' property, Mr. Patterson's property, and other nearby properties. *See* Applicants' Exhibit 3.

41.    Mr. Cushman also manipulated a second composite of Applicants' property to show what their property would look like from the Lake with the existing Structure replaced with the reconstructed Structure.  This rendering is shown in the top row of photos on Applicants' Exhibit 3.  The Court found that these photos, including the rendering of what the reconstructed Structure will look like from the Lake, provide a credible foundation for determining the composition of other nearby structures, and the impact of the proposed reconstructed Structure on the area and its nearby structures. In addition, the photos provide insight on the general character of the area.

42.    Mr. Cushman also prepared the plans for Applicants' reconstructed Structure that were presented to the DRB and the revised plans that were presented to this Court.

43.    Mr. Cushman provided credible testimony concerning the homes and structures surrounding Caspian Lake.  His research and preparation were extensive, as is evidenced by both his testimony and explanation of the shoreland development shown in the photographic depictions contained in Applicants' Exhibit 2.  This Exhibit presents great detail of the Lakeshore development, both from aerial photographs of the individual properties and of views of various structures, as taken while on the Lake.  His accompanying testimony provided credible depictions of both the individual structures and the character of the area, which consists of groupings of eclectic buildings that provide context for the area's character.

44. There are some larger homes, but many structures surrounding the Lake are somewhat smaller, in keeping with the country, lakeside character of the area. Many buildings, especially when viewed from the Lake, present themselves as one- or two-story structures, although there are several structures that present themselves as three- or even three and a half story structures. *See* Applicants' Exhibit 2, at Slides 3, 6, 9, 10, 12, 17, 18, and 20–24.

45. Mr. Cushman's familiarity with the Caspian Lake area and its development added much credibility to his testimony. In addition to being retained by Applicants, he has had many years evaluating the development surrounding the Lake and has spent much time over the years on the Lake, both for paddling and other activities.

46. Neighbors' testimony, particularly of Ms. Showers, established for the Court the beauty and historic character of the Caspian Lake area and the sincere love that they have for their neighborhood and surrounding community.

47. We are concerned, however, with Neighbors' suggestion that our evaluation of the proposed reconstruction should be limited to a comparison only to other accessory structures or boathouses. Such a limiting evaluation is not supported by the language chosen for Bylaws § 5.4(C)(5), which merely directs us to determine whether the proposed development is "compatible with other structures in the area affected."

48. The Town has adopted a Town Plan; the version in effect at the time Appellants filed their application was last amended on May 13, 2015; a copy was admitted at trial as Town Exbibit B.

49. The Town Plan includes important references to Caspian Lake. In its Land Use Policy section, the Plan directs that itemized land use districts be "maintain[ed]," including the following:

> Lakeshore District: established to protect surface water resources on Caspian and Eligo lakes and to retain the mix of residential/summer homes as well as the recreation uses traditional to these Lakes.

> Town Plan at 14.

50. The Town Plan also memorializes certain Natural Resource Goals that are relevant to the proposed project, including:

> 2. to preserve Caspian and Eligo lakes and surrounding land as . . . recreation areas;

11

4. to protect the shorelines of Caspian lake and other water bodies in town from erosion and overdevelopment; [and]

5. to ensure the views of our rural landscape are not *significantly altered* by man-made structures that are out of character with the community.

Town Plan at 27 (emphasis added).

51. We relied upon these Town Plan provisions in arriving at our understanding of the character of the area impacted by Applicants' proposed reconstruction.

**Conclusions of Law**

While we consider *de novo* appeals to our Court by hearing evidence anew, the legal issues we have the jurisdictional authority to consider are limited to those that an appellant presents in their statement of questions. In this proceeding, we have only one appellant: Applicants. Their Amended Statement of Questions, filed on April 5, 2019, contains three Questions. We already addressed Appellants' Question 1 in our pre-trial decision on cross-motions for summary judgment, by concluding that Applicants' Structure is more properly identified as an "accessory structure" than a "boathouse," as those terms are defined in the Bylaws. *See* In re Wright & Boester CU Appeal, No. 31-3-18 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. March 28, 2019) (Durkin, J.). No evidence or legal arguments presented at trial convinced this Court to reconsider and change this pre-trial determination. We therefore conclude that we must answer Appellants' Question 1 in the affirmative by concluding that Appellants' Structure is most properly characterized as an "accessory structure," as that term is used in Bylaws § 2.7(C).

I.      **Reconstruction of a Nonconforming Structure**

Before moving on to address Appellants' two remaining Questions, we must first note that while Applicants presented a revised reconstruction plan for their Structure that was different than the plan presented to the DRB, the revisions were made in response to concerns Neighbors expressed and were not so "material and substantial" as to require remand of their application to the DRB; rather, we could consider the revised plans, in the first instance, in this appeal. *See* In re Sisters and Bros. Invest. Grp., 2009 VT 58 at ¶ 19, 186 Vt, 103. These revisions are detailed in our Findings above, at ¶¶ 17–24, including a reduction in the increased height of the reconstructed Structure and small adjustments in where the building will sit.

We respect the DRB and the proceedings and deliberations it conducted, and we respect the general principal that any application that is materially or substantially changed after an appeal to this Court must be remanded to the appropriate municipal panel, so that it may review that substantially changed application in the first instance. *See* In re Lathrop Ltd. Partnership, 2015 VT 49 at ¶¶ 104–110, 199 Vt. 19 (quoting In re Maple Tree Place, 156 Vt. 494, 500 (1991)) (emphasizing that the environmental court "must resist the impulse to view itself as a super planning commission" and therefore must not address issues "never presented to the planning commission and on which interested persons have not spoken"). However, for the reasons above, we conclude that it was proper for this Court to review the revised plans even though the DRB had not previously reviewed those specific revisions.

We also note that the revised plans continue to present a building that is not in conformance with the various setback requirements contained in the current Bylaws. *See* Bylaws § 2.7(E) (establishing the current minimum setback requirements). However, the existing Structure is also not in conformance with these setback requirements.

Bylaws § 3.8(A) defines a nonconforming structure as any "legal structure which is not in compliance with the [current] provisions of this Bylaw concerning setback" and other dimensional requirements. There was no credible challenge at trial to Applicants' representation that their existing Structure lawfully pre-existed the current Bylaws, and we therefore conclude that the existing Structure is a lawful nonconforming structure. Any lawful noncomplying structure "may be allowed to exist indefinitely," subject to the restrictions that prohibit an expansion of its nonconformity. Bylaws § 3.8(A).

Applicants propose to move the reconstructed Structure slightly, so that it is more parallel with their easterly boundary, which will eliminate the possible encroachment onto their neighbors' land of the wooden dock attached to the Structure. This slight realignment will increase the distance of the Structure's southeasterly corner from the easterly boundary, thereby decreasing the setback nonconformity. A nonconforming structure can be moved "in a manner which will [not] increase the existing degree of nonconformance." Bylaws § 3.8(A)(1). We therefore conclude that this slight relocation of the reconstructed Structure is permissible under the Bylaws.

A nonconforming structure may also be "restored or reconstructed" in a manner which does "not increase the existing degree of nonconformance of the original structure," provided that the reconstructed structure receives conditional use approval. Bylaws § 3.8(A)(2). In an effort to respond to some of Neighbors' and the Town's concerns, Applicants have reduced the reconstructed Structure's height and have incorporated the other revisions referenced above. None of these revisions represent an increase in nonconformance to the applicable Bylaw provisions, when compared with the existing Structure. We therefore conclude that Applicants' plans constitute a reconstruction of a nonconforming structure that may be allowed, if it complies with the applicable conditional use criteria.

## II.    Conditional Use Criteria

In its review, the DRB rendered positive findings and legal conclusions on many of the applicable conditional use criteria. *See* DRB Decision at 2. In fact, there were only two conditional use criteria upon which the DRB rendered negative legal conclusions, and both are the subject to Appellants' two remaining Questions. We therefore review each of those Questions in turn.

### A.   *Conformance with Bylaws § 5.4(B)(2): impact upon the character of the area*

The applicable conditional use provision directs that a proposed project "shall not result in an undue adverse effect on . . . [t]he character of the area affected, as defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the Town Plan." Bylaws § 5.4(B)(2). This language mirrors that of the current enabling statute. *See* 24 V.S.A. § 4414(3)(A)(ii). To determine whether the proposed Structure will have an undue adverse effect, we are guided by the two-step "Quechee test" first established by the former Vermont Environmental Board in its review of Act 250 land use applications. This court and the Vermont Supreme Court has applied the Quechee test in municipal land use appeals. *See* In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 12, 195 Vt. 625, overruled in part on other grounds by In re Confluence Behavioral Health, LLC, 2017 VT 112, 206 Vt. 302 (approving use of the Quechee test as guidance in defining undue adverse impacts in zoning bylaws). Under the Quechee test,

> [the Court first] determines if the proposed project will have an adverse ... impact, and if so, it considers whether the adverse impact would be undue. An

adverse impact is considered undue if *any one* of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard ...; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336 (citations omitted).

The first step, then, is to determine whether the proposed Structure will have an adverse impact on the character of the area as defined by the policies and purpose statements set forth in the Bylaws and the Town Plan. *See* Bylaws § 5.4(B)(2); 24 V.S.A. § 4414(3)(A)(ii). The word "adverse" has been defined as "unfavorable, opposed, hostile." Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 17 (Vt. Envtl. Bd. Nov. 4, 1985).

The Bylaws provisions relating to the Shoreland Protection District (the zoning district in which Applicants' property is located) contain the following purpose provision:

The Shoreland Protection District is established to protect surface water resources on Caspian and Eligo Lakes and to retain the mix of residential/ summer homes as well as the recreation uses traditional to these lakes.

Bylaws § 2.7(B).[4]

Beginning with "surface water resources," we conclude that the proposed Structure will not have adverse impact. *See* id. While the position of the Structure will be relocated slightly, the building footprint will remain the same. Thus, the proposal will not increase impervious surface or associated runoff into the Lake. Applicants' engineer inspected the existing septic system for the Structure, which will remain in place for the proposed renovations. The flow through the system is not expected to increase because the renovations will not add new bathrooms or bedrooms. Finally, Applicants presented a detailed erosion and sediment control plan, the sufficiency of which was not contested at trial.

As to retaining "the mix of residential/summer homes as well as [traditional] recreation uses," we also conclude that the proposed Structure will not have an adverse impact. *See* id. Applicants' proposal does not represent new construction for a house or other use, rather it is a

---

[4] This purpose provision mirrors the applicable purpose provision in the Town Plan. See Finding 47, above.

renovation to an existing accessory structure that has long occupied a place on the property.  The addition of seven feet to the height of the proposed Structure will not appreciably alter the current mix of residential or summer homes around the lake.   Furthermore, the proposed Structure will remain in nearly the same position on the property and will not create new impacts on recreational activities like boating, walking, or swimming.  To the extent Neighbors suggest that the aesthetic impacts of the proposed Structure will affect recreation on and around the Lake, we address the issue of aesthetics further on in this decision.

Turning to the Town Plan, we can identify three relevant Natural Resource Goals:

2.  to preserve Caspian and Eligo lakes and surrounding land as . . . recreation areas;

4.  to protect the shorelines of Caspian lake and other water bodies in town from erosion and overdevelopment; [and]

5.  to ensure the views of our rural landscape are not significantly altered by man-made structures that are out of character with the community.

Town Plan at 27.

To achieve these goals, the Town Plan includes a policy to "adopt shoreline protection provisions in the Zoning Bylaw," which the Town has accomplished through the enactment of Bylaws Article 8.  *See* id.; Bylaws Art. 8.

In turn, Article 8 sets forth several purposes for the "Shoreland Protection District Regulations," including:

B.  To promote the protection of naturally vegetated areas and the re-vegetation of native plants and trees along water bodies within the Town to reduce the impact of stormwater runoff, prevent soil erosion, protect wildlife and fish habitat and maintain water quality.

E. To allow for compatible forms of shoreland Development that will preserve shoreland vegetation, encourage re-vegetation, protect wetlands and terrestrial and aquatic wildlife habitats, and conserve the scenic beauty and recreation potential that currently exists along shorelands within the Town of Greensboro.

Bylaws §§ 8.2(B), (E).

The Natural Resource Goals and the purposes of Bylaws Article 8 are "broad and aspirational," such that "the task of measuring [the] proposed use[] against [them] is a difficult

16

one." *See* In re Rublee 246 White Birch Lane CU, No. 140-11-15 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Aug. 23, 2016) (Walsh, J.).  To the extent these statements impose enforceable parameters related to the character of the area, we conclude that the proposed Structure will not create adverse impacts.[5]

The common themes among the statements include conservation of habitat, water quality, vegetation, and recreational opportunities; erosion control; and development that is compatible with the current characteristics of the area.  For the reasons we have already outlined, we conclude that the proposed Structure will not have adverse impacts related to stormwater, erosion, water quality, or recreation opportunities.  With respect to vegetation specifically, Applicants have represented that existing trees and vegetation will remain undisturbed.  They propose to plant four new trees, and their erosion and sediment control plan includes measures to restore any disturbed areas with seeding, mulching, and other strategies. Thus, we conclude that there will not be an adverse impact on lakeside vegetation.

Much of the testimony at trial focused on the aesthetic impact of the proposed Structure, including its height and general appearance.  Neighbors maintain that the Structure will be incompatible and out of place when viewed in the context of its surroundings, and therefore will have an undue adverse effect on the character of the area as it currently exists. While the Bylaws and the current enabling statute focus on the character of the area as defined by the Town through written purpose and policy provisions, we have historically looked to existing uses when assessing the character of the area.  *See* Bylaws § 5.4(B)(2); 24 V.S.A. § 4414(3)(A)(ii); *see also* In re Rublee, No. 140-11-15 Vtec at 8–9 (Aug. 23, 2016) (recounting the historic understanding and progression of the "character of the area" analysis).  We find it appropriate to do so here, particularly because the Town's purpose provisions stress "compatible forms of shoreland [d]evelopment" and conservation of "the scenic beauty and recreational potential that currently exists."  Bylaws § 8.2(E).

---

[5] Neighbors appear to challenge the proposed Structure under other regulations set forth in Article 8.  Our jurisdiction in this appeal is limited to the issues raised in Applicants' Statement of Questions, and with respect to Question 2, the issue is the character of the area. *See* Amended Statement of Questions, filed Apr. 5, 2019; Vill. of Woodstock v. Bahramian, 160 Vt. 417, 424 (1993). We must refer to applicable purpose provisions and policies for our character of the area analysis pursuant to Bylaws § 5.4(B)(2), but we may not reach unrelated issues such as the proposal's conformance with a separate set of regulatory requirements. *See* Vill. of Woodstock, 160 Vt. at 424.

A primary concern, and indeed the subject of Applicants' Question 2, is the height of the proposed Structure and its impact on the character of the area.  First, we note and address a conflict in the way the parties suggest that our analysis should proceed.  Neighbors point out, correctly, that the reconstructed Structure, if approved, would be the only three-story accessory structure on Caspian Lake.[6]  While this characterization may be technically true, it provides a far too-narrow vision of the character of the area and this proposed building. The applicable conditional use provision does not limit our comparison to only other accessory structures that serve a similar purpose; the Bylaw discusses effects on the character of the area affected.  Bylaws § 5.4(B)(2).  While accessory structures are undoubtedly a part of that character, there are many more buildings that compose the full picture of the area.

Second, we agree with Applicants' assertion that when considering the proposed Structure's impact, we should not look at the numerical height of the building in isolation, but rather within the context in which it sits.  Most of the properties surrounding the Lake slope down to the Lake.  Thus, the tops of many buildings (even two-story buildings) that are set father back from the Lake appear higher in elevation than the top of the proposed Structure.

In addition, many of the buildings surrounding the Lake are clustered with cedar trees, birch trees, and undergrowth, which at least partially obscure the view of them.  Applicants' reconstructed Structure will be set within existing trees and vegetation, and Applicants will add new trees to the front and westerly side of it, thereby screening the view of it from other properties and the Lake.  The additional tree plantings and landscaping Applicants propose will mitigate its visual impact.  We will therefore condition our approval on a requirement that Applicants maintain these trees and landscaping, and to replace any diseased or dying trees and other plantings.

Mr. Cushman provided the Court with a credible and mostly uncontradicted analysis of the character of the area surrounding Caspian Lake.  Through his testimony, including

---

[6] We find Neighbors characterization of Applicants' proposal as a three-story structure to be a bit deceptive. The first "floor" of the revised project plans calls for a dirt-floor crawl space, about four feet in height, where canoes, kayaks and equipment will be stored.  The two full stories will be used for a sink, shower, and living space.  No kitchen or cooking facilities are proposed.  In fact, when viewed from the landside of the Structure, closest to (but not visible from) Neighbors' properties, the reconstructed Structure will present itself as a two-story structure.

descriptions aided by the photographic array that he prepared as Applicants' Exhibit 2, Mr. Cushman provided a comprehensive and contextualized view of the existing developments surrounding Caspian Lake. Exhibit 2 is a credible compilation of 24 sheets of shoreline photographs and Google earth satellite images and a corresponding spreadsheet specifically identifying 49 residential structures appearing along various portions of the Caspian Lake shoreline. Horizontal lines, at 10-foot intervals, have been added to some of the building photographs so an observer may compare the perceived height of various buildings to the perceived height of the proposed reconstructed Structure. Many of the existing Lakeside structures are readily perceived as taller than Applicants' proposed structure. In this context, and given the screening provided by Applicants' landscaping proposal, we conclude that the height of the proposed Structure will not adversely affect the character of the area.

Neighbors contend that other aesthetic attributes of the proposed Structure render it incompatible with the character of the area. We cannot agree. Caspian Lake provides an eclectic array of residential structures and uses on the surrounding properties. Applicants' property has long hosted a residence, shed, and accessory structure. The proposed project merely replaces the existing accessory structure with a reconstructed structure, serving the same purposes, on an identical footprint, at a location only several inches rotated from its original location, so as to address concerns expressed by the Neighbors and Town officials. This slight movement on the Structure's location will allow it to reduce the noncompliance with the side yard setback requirement. The earthen tones of the stain or paint to be used on the Structure's exterior, finished with materials similar to the original Structure, will lessen the visual impact and allow the Structure to blend in with the surrounding area. The revisions to the roof lines bring the reconstruction more in line with the roof designs of other area buildings. All these characteristics result in a complement to, and not an adverse impact upon, the character of the area.

Neighbors also express particular concerns about Applicants' proposed increase in the number and size of the windows proposed for the reconstructed Structure. But their concern appeared more in general opposition to Applicants improving their accessory structure. A review of the existing residences and accessory structures surrounding the Lake shows a wide variety of

windows by size and number. Applicants' proposal seems much more in line with the existing window displays than adverse to it.

For all these reasons, we conclude that Applicants' proposed reconstructed Structure will not have an adverse impact upon the character of the area affected. Because the impact will not be adverse, we do not reach the second step of the Quechee test. *See* Times & Seasons, LLC, 2008 VT 7, ¶ 8.

Change to any area can be disruptive, especially to an area as pristine and tranquil as Caspian Lake. But the standard that the Town established in its Bylaws is not that any disruptions shall be prohibited. Rather, the community decided that a property owner may only be prevented from pursuing their desired improvements when their proposed project would have an adverse impact upon the character of the area, and further that such adverse impact would be undue.

As noted above, we conclude that the characteristics of Applicants' proposed project complement and are not adverse to the character of the area. But even if we were to find that their proposal was adverse, we cannot find that its adverse impact is undue. The project is not in conflict with any specific and applicable purpose provision in either the Bylaws or the Town plan. Applicants, when faced with the neighbors' and Town's concerns, adopted meaningful mitigation measures, including a lowering of the ground floor into a four-foot-tall crawl space, thereby lowering the total height of the building by several feet. They have also pledged to protect the existing trees and undergrowth, while adding four trees that will screen the lakeside view of the reconstructed Structure. We conclude that there is no credible basis for a legal conclusion that Applicants' proposed building has an undue adverse impact upon the character of the area.

*B. Conformance with Bylaws § 5.4(C)(5): compatibility with other structures in the area*

The applicable conditional use provision directs that the "[l]ocation, on the lot, of structures and service areas shall be compatible with other structures in the area." Bylaws § 5.4(C)(5). Our analysis here is a bit more straight forward, since this specific standard from the conditional use provisions does not require the "undue adverse impact" analysis of the prior provision.

Applicants' proposal has no change in "service areas." Its location is nearly identical to the existing structure. We therefore conclude that its minor change in proposed location and lack of any change suggested in a service area causes us to conclude that Applicants' proposed project conforms to the specific provisions of Bylaws § 5.4(C)(5).

In reaching this conclusion we reference Applicants' Exhibit 3: a very credible demonstrative exhibit, particularly when put into context by Mr. Cushman's credible supporting testimony, of the relative minor differences between Applicants' existing Accessory Structure and the proposed reconstructed Structure. When viewed from the Lake, the reconstructed Structure will appear much in conformance with the other nearby existing structures. Its height will present itself as lower than the nearby residences, and its full view will be obscured by the existing trees and those to be newly planted. The new Structure will appear diminutive when compared with the surrounding existing trees and those behind it. It and its location will be compatible with the other structures in the area.

Neighbors present a thorough and thoughtful analysis, but one that appears to delve well beyond the language of this Bylaw provision. Questions about design concepts do not appear appropriate in light of the limiting language of this conditional use specific standards. We therefore decline to embark on the expansive analysis suggested by Neighbors, since it is not authorized by the Bylaws language that in within our jurisdictional scope.

For all these reasons, we conclude that the location of the proposed reconstructed Structure and its service areas is compatible with other structures in the area and that it therefore is in conformance with Bylaws § 5.4(C)(5).

**Order**

For the foregoing reasons, we conclude that Applicants' proposed reconstructed Accessory Structure will not have an undue adverse impact upon the character of the area (thereby being in conformance with Bylaws § 5.4(B)(2)), will be compatible with the other structures in the area affected (thereby being in conformance with Bylaws § 5.4(C)(5)), and is allowable under the applicable Bylaw provisions governing reconstruction of lawful nonconforming structures. Given that the Town of Greensboro Development Review Board rendered positive findings and legal conclusions under all other applicable conditional use criteria, we conclude that Applicants' application for a permit to reconstruct their Accessory Structure is hereby **APPROVED**, subject to the following conditions:

1. The reconstruction shall be completed in accordance with the revised plans presented at trial as Applicants' Exhibits 4 and 5; and

2. All new trees and other plantings presented on Applicants' revised plans shall be maintained and replaced if they become fatally diseased or dying.

The pending application is hereby **REMANDED** to the Town of Greensboro Development Review Board, so that the ministerial act of issuing a permit in conformance with this Merits Decision may be completed.

A motion to stay was pending at the time we began our preparation of this Merits Decision. That motion is **DENIED** for the reasons stated in a separate Entry Order.

This completes the current proceedings before this Court. A Judgment Order accompanies this Merits Decision.

Electronically signed on September 3, 2020 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division

22